THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS KRAWIEC, Defendant-Appellant.

Second District    No. 2—93—0135

Opinion filed May 25, 1994.

Myron B. Goldstin, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

After a bench trial, the defendant, Thomas Krawiec, was convicted of stalking (720 ILCS 5/12—7.3(a)(2) (West 1992)) and sentenced to 30 months' probation with conditional discharge. On appeal, the defendant contends that: (1) the evidence did not prove him guilty beyond a reasonable doubt; and (2) the stalking statute is unconstitutional. We affirm.

The defendant was charged with stalking his wife, Marilyn Krawiec. In February 1992, Marilyn Krawiec had filed a petition to dissolve their marriage. At the time of the alleged offense, Marilyn Krawiec and the Krawiecs' two children, Matthew (age 11) and Jennifer (age 15), resided in a rented house at 681 Greenbriar in Lake Forest. They had moved out of the family home about four months after Marilyn Krawiec filed her petition to dissolve the marriage.

The indictment, issued on July 29, 1992, alleged that the defendant committed the following acts. On or about July 18, 1992, the defendant transmitted to Marilyn Krawiec a threat with the intent to place her in reasonable apprehension of bodily harm. In furtherance of the threat, the defendant, knowingly and on two separate occasions, placed Marilyn Krawiec under surveillance by remaining present outside of her residence.

The State's first witness was Lake Forest police officer Michael Vukson. During June and July 1992, Vukson worked as a patrol

supervisor. On June 18, 1992, Marilyn Krawiec called him once or twice to discuss a domestic problem. At about 10:30 p.m., Vukson saw the defendant, who was standing in the front yard at 681 Greenbriar. The defendant was not violating any laws, and he left upon a warning from Vukson.

Vukson did not personally recall hearing from Marilyn Krawiec before June 18, 1992. According to a department logbook, she had notified the Lake Forest police several times previously about alleged domestic problems with the defendant.

Dennis Smith, a Lake Forest police department patrol officer, testified that, on July 18, 1992, he was dispatched to 681 Greenbriar after the police received "two hang up 911 calls with arguing in the background." On arriving, he spoke with Marilyn Krawiec and a man later identified as her boyfriend, David Fenkel. Smith put out a local lookout for the defendant. At about midnight, Deerfield police stopped a car driven by the defendant and also occupied by Matthew Krawiec. The Lake Forest police brought the defendant and Matthew to the station, where the defendant signed a *Miranda* waiver and spoke to Smith.

The defendant gave Smith the following account of the evening's events. He took his son to 681 Greenbriar to show Matthew that the boy's mother was "fooling around" with another man. The defendant, carrying his video camera, entered the house by opening a lock box, the combination to which he learned from Matthew. After the defendant and Matthew entered the house, the defendant started to videotape Marilyn and Fenkel in the bedroom. An argument ensued. The defendant admitted he pushed Marilyn in the face with an open hand when she tried to stop the videotaping. Also, he admitted he swore at Marilyn and knocked two television sets onto the floor. The defendant said he would go to where Jennifer was baby-sitting so Jennifer could watch the tape.

Upon leaving his wife's residence, the defendant gave Matthew the tape and told the boy to make sure nobody found out about it. Matthew hid the tape in the crotch of his pants. At the station, Matthew handed the tape over to the police. At trial, the tape was admitted into evidence by stipulation.

Marilyn Krawiec testified that at the time of trial, she and the defendant were separated. About four months after she filed for a dissolution, she and the children moved to the rented house on Greenbriar.

On July 16, 1992, she was celebrating her birthday with her children at the Greenbriar house when she received a series of telephone calls from the defendant. In one of the calls the defendant said, "I'm

your worst nightmare. You are never going to be rid of me. I'm the Betty Broderick of LaJolla, only I am Tom Krawiec of Lake Forest." He added that, unlike with Betty Broderick, "[t]hey will never find your body."

Marilyn Krawiec next related the events of July 17, 1992. That day, the children were with the defendant. When Marilyn came home from work, she saw a note on her pillow. The note was in the defendant's handwriting and said, "For the greatest ~~back~~ body rub you ever had come to the Shoreline Motel on Rt 41 Room 16. PS Bring the Baby Oil." The note was admitted into evidence at trial.

On July 18, 1992, at about 9 a.m., the defendant again called Marilyn and told her, "if you go through with this divorce, you're a dead woman. I am not going to do it myself. I am not that stupid, but I know plenty of people that will do it for me." He added, "Marilyn, you're really going to regret this."

Marilyn Krawiec testified that July 18, 1992, at about 10:30 or 11 p.m. the defendant forced his way into her bedroom carrying a video-camera. Several times, Marilyn tried to call the police, but each time the defendant or Matthew prevented her.

The parties stipulated that Matthew Krawiec would testify as follows. At about 5:30 p.m. on July 18, 1992, the defendant picked up Matthew, dropped off Jennifer so she could baby-sit, and drove with Matthew to the Greenbriar house. The defendant videotaped the outside of the house. David Fenkel's car was parked in the driveway, and another car was parked in front of the house. The defendant and Matthew went to Sluggers. The defendant wanted to return to Marilyn's house to see if David's car was still there; if it was, he would break the car's window with a baseball bat.

When the defendant and Matthew returned, the defendant, carrying his videocamera, asked Matthew to let him in. Inside, the defendant broke two television sets and knocked a portable phone out of Marilyn Krawiec's hand when she tried to call 911. The defendant and Matthew rode off to where Jennifer was baby-sitting to show her the tape of her mother in bed with Fenkel. The defendant gave Matthew the tape to hide after he saw a Deerfield police car pursuing him. At the police station, Matthew took the tape from his pants and gave it to Officer Smith.

The videotape that defendant made on the evening of July 18, 1992, is part of the record on appeal. The trial judge viewed the tape prior to trial. At the beginning of the tape, the defendant, accompanied by Matthew, drives up in front of the Greenbriar house. The defendant notes the presence of several cars, including what he tells Matthew he believes is David's car. The videotape captures a view of

the outside of the house, the front lawn, and the street. Matthew asks the defendant if Marilyn Krawiec is home. The defendant replies that "she's not home." The defendant again records a view of the house and the surrounding area and asks Matthew if the boy is "witnessing this."

In the second part of the videotape, the defendant and Matthew return to the Greenbriar house later that evening. By now it is dark outside, but the videocamera focuses on the house, particularly the lighted living room. The defendant and Matthew whisper back and forth and walk into the house. The defendant shuts the door.

Inside the house, the defendant forces his way into the bedroom. He sees a man who is lying in bed and demands that the man show his face for the camera. Marilyn Krawiec is naked; she steps away from the bed and starts to dress. As the defendant is filming, he utters obscenities and makes remarks such as, "that's what we want to see"; "I wanted your son to see this"; and "Now the kids know what their mother is." Matthew tells Marilyn Krawiec that she is stupid. The defendant tells Marilyn that, if she calls the police, she "will see what happens to [the man in her bed]." The defendant warns the man not to visit the house again.

As the defendant prepares to leave, he tells Marilyn he will "teach you a f------ lesson you'll never forget." He asks, "do we have it, Matt?" and "didn't I tell you, Matt?" After Matthew expresses his amazement at his mother's conduct, the defendant tells him that they will go to show Jenny the tape.

After the State rested, the defendant moved for a directed finding. He argued that Marilyn Krawiec's testimony that the defendant had threatened her was not credible. Also, he argued that the State had not produced evidence that defendant had, on two separate occasions, placed Marilyn Krawiec under "surveillance" as that term is used in the stalking statute. The defendant argued that videotaping Fenkel's car was not the surveillance of Marilyn Krawiec, particularly as she was not home at that time.

The trial judge denied the motion for a directed finding. The judge explained that there was evidence that the defendant had made threats against Marilyn Krawiec, including not only the threat to kill her but also the threat that she would "never get away" from him and that she would suffer harm if she continued to seek a dissolution of the marriage.

The trial judge then explained that he believed there was sufficient evidence that, on two occasions on July 18, 1992, the defendant had, in furtherance of his threat (or threats), subjected Marilyn Krawiec to surveillance. The judge stated that "in light of the broad

nature of [defendant's] threats," defendant's actions on the evening of July 18, 1992, could be said to have been "in furtherance" of the threats.

The judge agreed with the prosecutor that, under the statute, a person need not be present to be subjected to "surveillance" outside her home or vehicle. The judge found there were two incidents of surveillance: (1) the first time that the defendant went to the house at Greenbriar and taped the house and attempted to put Marilyn Krawiec under watch; and (2) when the defendant returned a short time later. The judge noted that although the defendant argued that the entry into the home was not surveillance, the tape showed that before the defendant entered, he "did focus the camera inside the living room that was vacant. Certainly, I think that evidence is of a surveillance nature."

The defendant denied that he threatened Marilyn Krawiec during their telephone conversations of July 16, 1992. However, he admitted that many times he had told Marilyn, the children, or others, "I'll kill you," but these were outbursts which he did not mean literally. In all the time they were married, he had not "laid hands" on Marilyn.

At some point, the defendant became curious about Marilyn Krawiec's personal life because he had received conflicting stories from his children. He had heard Jennifer mention "David," but he did not know who "David" was. He drove by the house on Greenbriar so that he could find out who David was, not to place Marilyn under surveillance or to follow her. He did not believe that Marilyn was home at the time he drove to the Greenbriar house. As the defendant approached the house, he saw the two cars, one of which was parked in front and the other of which was in the driveway. He videotaped both cars, making sure to include the license plates. He planned to give the information to his marriage lawyer. On cross-examination, the defendant admitted that he videotaped not only the vehicles but also the house.

After the defendant took Matthew to Sluggers and to visit Jennifer, he drove back to Marilyn's house. Carrying his videocamera, the defendant walked around the house. From the outside, he did not see Marilyn and David. As he walked around the house, he videotaped what he saw; this included the empty living room. Noticing that a light was on in the living room, he guessed that Marilyn and David were in the bedroom.

The defendant entered the house, bringing Matthew with him so that the boy could see what was going on inside the house. At trial, the defendant explained that he entered in order to film what he

could inside the house; primarily, he wanted to catch Marilyn and David together because his marriage lawyer had told him this would help him to get custody of the children. The defendant's marriage lawyer had told him to investigate Marilyn's suspicious activities, though the lawyer never specifically said the defendant should do the investigating on his own.

Inside the bedroom, the defendant filmed Marilyn and David together. He testified that, although he became loud and profane, he never struck or attempted to strike either Marilyn or David.

In finding the defendant guilty, the trial judge first explained that the State had proved the existence of the "threat" specified by the stalking statute. The defendant's phone calls of July 16, 1992, and July 18, 1992, produced a "multifaceted" set of threats, including not only the threat to kill Marilyn but also that she "would never be rid" of him.

The judge explained why he believed the defendant's actions were "in furtherance" of the threat. The judge focused on the defendant's behavior inside Marilyn's house. The judge found that, although obtaining evidence for the dissolution proceedings was one of the defendant's motivations, the defendant went there primarily to "make [his] wife miserable, and [he was] going to expose [his] son to the affair that she was having." The judge added that the defendant went to the Greenbriar house to make Marilyn "feel fear, make her see that you have a potential for violence. You pushed her. You broke a couple of T.V.s in the process." The judge concluded, "I think there is enough there to say that [the defendant's actions] that night were in furtherance of the threat, so I will enter a finding of guilty."

The court denied the defendant's post-trial motion and imposed sentence. Defendant timely appealed.

Defendant's main contention on appeal is that he was not proved guilty of stalking beyond a reasonable doubt. The statute under which defendant was convicted became effective July 12, 1992, and reads (as then in effect) as follows:

"(a) A person commits stalking when he or she transmits to another person a threat with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint, and in furtherance of the threat knowingly does any one or more of the following acts on at least 2 separate occasions:

(1) follows the person, other than within the residence of the defendant;

(2) *places the person under surveillance by remaining present outside his or her* school, place of employment, vehicle,

other place occupied by the person, or *residence* other than the residence of the defendant." (Emphasis added.) 720 ILCS 5/12—7.3(a)(West 1992).

■ We have emphasized the statutory language most in need of interpretation for purposes of this appeal. The indictment charged the defendant only with those specific acts, allegedly in furtherance of his threat, that we have emphasized. The State was required to prove the essential allegations of the indictment. (*People v. Rothermel* (1982), 88 Ill. 2d 541, 544.) Thus, we must decide whether the State produced sufficient evidence of: (1) a threat; and (2) two separate incidents of surveillance by the defendant—specifically, as charged in the indictment, two occasions where the defendant placed Marilyn Krawiec under surveillance by remaining present outside her residence.

When reviewing the sufficiency of the evidence, we are limited to asking whether the evidence, when viewed in the light most favorable to the prosecution, is sufficient to convince any rational trier of fact that the elements of the offense have been proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) It is not a reviewing court's prerogative to reweigh the evidence or to reassess the witnesses' credibility. *People v. Steidl* (1991), 142 Ill. 2d 204, 226.

The defendant argues first that there was no credible evidence that he transmitted a threat to Marilyn Krawiec with the intent to put her in reasonable apprehension of harm. The defendant argues that Marilyn Krawiec's account of the telephone conversations of July 16, 1992, is not credible.

We find that the evidence, viewed most favorably to the prosecution, supports the trial court's finding that the defendant's threatening words were intended to place Marilyn Krawiec in reasonable apprehension for her safety. See *Collins*, 106 Ill. 2d at 261.

Having decided that there was legally sufficient evidence that the defendant threatened Marilyn Krawiec, we consider now whether the State adduced sufficient evidence that, on two separate occasions, the defendant acted *"in furtherance"* of the threat by placing Marilyn Krawiec *"under surveillance"* outside her residence. We have emphasized the above-quoted portions of the statute because we must consider these phrases in order to determine whether the various incidents in evidence fit within their meanings.

The meaning of the stalking statute appears to be a matter of first impression in this State. The parties have cited little authority to substantiate their characterizations of the "purpose" of the legislation. In particular, defendant's brief provides us with no more than assertions backed by no supporting authority. Thus, we review in some detail the crucial statutory language.

In construing the statute, we have, of course, sought primarily to give effect to the intent of the legislature. (See *People v. Bole* (1993), 155 Ill. 2d 188, 195; *People v. Gassman* (1993), 251 Ill. App. 3d 681, 689.) Ordinarily, the statutory language itself is the best guide to the legislature's intent, and, insofar as that language is clear, we need inquire no further. (*Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund* (1993), 155 Ill. 2d 103, 111; *Gassman*, 251 Ill. App. 3d at 689.) Unless there is a legislative intent to the contrary, words in a statute are to receive their ordinary and popularly understood meanings. (*People ex rel. Daley v. Datacom Systems Corp.* (1991), 146 Ill. 2d 1, 15.) Insofar as the statutory language is unclear and ambiguous, we must ascertain the reasons for the law and the evils the statute seeks to remedy. (*Bole*, 155 Ill. 2d at 195.) Our inquiry may include consideration of aids to construction, such as legislative history. *People v. Boykin* (1983), 94 Ill. 2d 138, 141.

■ We agree with the State that an act may be "in furtherance" of a threat of violence even if the act does not result in violence and even if the actor intends no violence to result from the act. It is sufficient that the act is performed with the intent to reinforce, heighten, or augment the threat that was made earlier. Our interpretation derives support both from the language of the statute and from a consideration of the statute's history.

The statute itself requires only that the offending acts be in furtherance of the threat, not that they be in "fulfillment" of the threat or that they have any specified consequences. To "further" something is to "help forward" or "promote" it. (Webster's Third New International Dictionary 924 (1986).) Insofar as a defendant acts to promote or help forward his prior threat, his actions, if otherwise within the scope of the statute, support a conviction of stalking.

Even if the term "in furtherance" might be considered ambiguous, the legislative history of the stalking statute demonstrates that to be guilty of stalking, one need not produce, or even intend to produce, the physical harm that he has earlier threatened. The statute was intended to prevent intimidation and the infliction of reasonably grounded apprehension and fear. The aim of the legislature was not only to prevent violent attacks by outlawing those actions that served as a prelude to such an attack, but also to prevent the terror produced by harassing actions in and of themselves. See O'Reilly, *Illinois' Stalking Statute: Taking Unsteady Aim at Preventing Attacks*, 26 J. Marshall L. Rev. 821, 838-39 (1993) (noting that proponents of the statute emphasized instances of individuals who repeatedly followed or threatened people, thereby causing apprehension or terror without necessarily intending to inflict bodily harm).

We conclude that the stalking law was intended to prevent the placing of a Damoclean sword over the head of the victim. Contrary to what the defendant appears to argue (in claiming that there was no "bodily harm" in this case), it is of no moment that the sword does not fall or that the defendant never intended it to fall.

We now turn to the phrase "under surveillance" as it is used in the statute. The defendant apparently argued at trial (and appears to argue on appeal) that: (1) there can be no surveillance of a person outside her home if the person is not within the home; or, at least, (2) there can be no proof beyond a reasonable doubt of a defendant's intent to engage in surveillance if the evidence shows that the defendant did not believe that the victim was home at the time that he engaged in an the alleged surveillance. We do not agree with the defendant on either score.

●3 We believe that the statute provides its own definition of "surveillance." In relevant part, the Act defines "plac[ing] the person under surveillance" as "remaining present outside [the person's] *** residence." (720 ILCS 5/12—7.3(a)(2) (West 1992).) It is the act of remaining in the vicinity of the would-be victim's house, with the requisite intent to further a threat, that is prohibited. Such a reading accords with the intent of the legislature to address certain evils, including what might be deemed a paradigm case of stalking: "lying in wait" in anticipation of the victim. See O'Reilly, 26 J. Marshall L. Rev. at 838.

■ We now apply the foregoing discussion to the evidence in this case. We believe there was sufficient evidence for the trial judge, as the fact finder, to conclude that on two separate occasions on the evening of July 18, 1992, the defendant acted in furtherance of his threat by placing Marilyn Krawiec under surveillance outside her home. We accept the trial judge's characterization of the threat as "multifaceted"—a threat not only that the victim would or might be killed or physically harmed, but also that she would be unable to "rid" herself of the defendant or to proceed, without fear for her physical safety, with the dissolution proceeding. We note that the defendant has never disputed the trial judge's characterization of the threat, although he has denied that he ever made the threat.

We have viewed the videotape of July 18, 1992. It is consistent with Matthew Krawiec's stipulated testimony, and the defendant's admission on cross-examination, that the defendant *twice* videotaped the outside of Marilyn Krawiec's house. The videotape leaves no reason to question the trial judge's conclusion that, on the second of these occasions, the defendant was carrying out his announced threat to intimidate Marilyn Krawiec, to humiliate her in front of the chil-

dren (directly or indirectly), and to increase her fear of him. The defendant's surveillance of Marilyn Krawiec prior to his entry was part of this plan; it was a form of "lying in wait" or "stalking" in the commonly understood meaning of such terms. The trial judge properly concluded that the second part of the videotape portrayed one act of surveillance in furtherance of the defendant's "multifaceted" threat.

We believe that the trial judge properly reached the same conclusion about the actions of the defendant that were portrayed in the first part of the videotape. Here, as later, the defendant remained outside his wife's residence. His intent was to learn information, compromising to Marilyn, that he could use to further his threat that trouble would follow if she defied his wishes. The taping of the house and the cars could be considered surveillance as the stalking statute uses that term. The trial court properly concluded that the action was part of a scheme that was intended to further his earlier threats of intimidation and humiliation.

We conclude that the evidence was legally sufficient to prove the defendant guilty as charged in the indictment.

■ The defendant's second issue on appeal requires little discussion. Without citing any relevant authority, the defendant argues that the stalking statute's provisions for holding a defendant without bail before trial violate several Federal and State constitutional guarantees. Because the defendant's arguments consist of bare assertions, they are waived. (See 145 Ill. 2d R. 341(e)(7); *People v. Trimble* (1989), 181 Ill. App. 3d 355.) Also, we agree with the State that the defendant, who was never subjected to the provisions he now attacks, lacks standing to raise his constitutional challenges. See *People v. Blackorby* (1992), 146 Ill. 2d 307, 320.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, P.J., and McLAREN, J., concur.