THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID
A. HOLT, JR., Defendant-Appellant.

Third District    No. 3—94—0566

Opinion filed April 21, 1995.

John P. Vespa, of Peoria, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LYTTON delivered the opinion of the court:

Defendant, David A. Holt, Jr., appeals his conviction for stalking under section 12—7.3(a)(2) of the Illinois Criminal Code of 1961 (720 ILCS 5/12—7.3(a)(2) (West Supp. 1993)) following a bench trial. We affirm.

## FACTS

Defendant and the victim, M.S., dated from January 1993 until mid-August 1993, when M.S. ended the relationship. M.S. testified that defendant became angry and verbally abusive at that time, threatening to "make it so that [she] couldn't live in Peoria any more, and *** that [she] would have to deal with him the rest of [her] life, whether [she] married him or not." Defendant also stated that although he "might not do anything, *** you never know what [his] friends might do."

M.S. testified that defendant called her the next day and argued that they should not end the relationship. When M.S. disagreed, defendant renewed his prior threats, reminding M.S. of the unpredictable nature of his friends and his intention to do all he could to force her to move away from Peoria because chance meetings would be too painful for him. Two weeks later, defendant proposed marriage to M.S., but she refused his offer.

Defendant also made a series of telephone calls to Tammy Ford, a mutual acquaintance, seeking advice on how to win M.S. back. Over the course of these conversations, Ford became increasingly concerned about defendant's deteriorating and depressed mental state. When defendant told Ford that "[i]f he could not have [M.S.] then no one would have her," Ford reported the conversation to M.S. out of concern for her safety. M.S. immediately told defendant that she wanted no further contact with him.

The trial court found that between August and early December 1993, defendant "became obsessed with prank calls to M.S., making

perhaps as many as 200, as well as becoming bent on a course of conduct whereby he sent her cards, put in her mail box small picture posters of M.S. alleging she had genital herpes, pasted on her car bumper stickers with her name emblazoned upon them, associating her with genital herpes. Defendant even went so far as to place a sign in the yard of M.S.'s parents in Barrington Hills, Illinois, stating "get your genital herpes here." In response to these acts, M.S. obtained an order of protection against defendant on December 10, 1993.

Defendant and M.S. had two inadvertent meetings in public after December 10, 1993, but these incidents were inconsequential. On Friday, February 25, the first of the incidents that formed the basis for the present stalking charge occurred when M.S. saw defendant at the Owens Recreation Center, the only ice skating facility in Peoria. On that date, M.S. was leaving the ice rink at the end of her private skating time and saw defendant lacing up his skates. She testified that she became frightened because defendant had never shown any interest in skating during their relationship and she feared that he would try to harm her or restrict her movement.

On the following Monday, M.S. noticed defendant watching her from outside the rink for 40 minutes of her 45-minute private skating session. Similar incidents began to occur on other Fridays and Mondays. M.S. noted that defendant arrived at the ice rink up to 30 minutes before the start of the scheduled public skating time on March 4, March 7, and March 28. In each instance, defendant stared at M.S. through the window of the observation area adjoining the ice rink for the remainder of her private skating session. M.S. testified that she was frightened each time she saw defendant at the ice rink.

Defendant was initially charged with two counts of stalking under section 12—7.3(a) of the Illinois Criminal Code (720 ILCS 5/12—7.3(a)(1), (a)(2) (West Supp. 1993)). He was arraigned on these charges on January 27, 1994, approximately one month before the incidents at the skating rink began. The two original counts were later dismissed with leave to reinstate, and two new stalking counts were added, based on the events at the Owens Recreation Center. At the close of the State's case in the bench trial, the trial court acquitted defendant of count III of the indictment, which required transmission of a threat (720 ILCS 5/12—7.3(a)(1) (West Supp. 1993)). The trial continued on count IV, which required placing the victim under surveillance and "in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint" (720 ILCS 5/12—7.3(a)(2) (West Supp. 1993)). After closing arguments were completed, the trial court found defendant guilty on count IV of the stalking charge.

Defendant filed a motion to reconsider; the trial court denied the motion and sentenced him to four months in prison and 30 months' probation, with the first six months being intensive and the first three months including electronic monitoring. Defendant was also sentenced to perform 150 hours of public service work and to pay $1,145 in restitution. Defendant appeals.

## I. STATUTORY INTERPRETATION

Defendant was convicted under section 12—7.3(a)(2) of the Illinois Criminal Code of 1961, which states:

"A person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and:
*** 

(2) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint." (720 ILCS 5/12—7.3(a)(2) (West Supp. 1993).)

The stalking statute specifies that a defendant " 'places a person under surveillance' by *remaining present outside* the person's school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant." (Emphasis added.) 720 ILCS 5/12—7.3(d) (West Supp. 1993).

Defendant argues that this language is clear and the trial court improperly construed the statute's "remaining present outside" requirement to include instances in which the defendant and the victim are inside the same primary structure, in this case, the Owens Recreation Center. Defendant claims that this interpretation impermissibly expands the prohibited conduct beyond that specified by the statute.

In construing a criminal statute, we seek to ascertain the legislature's intent; the statutory language itself provides the best guide to legislative intent. (*People v. Krawiec* (1994), 262 Ill. App. 3d 152, 160, 634 N.E.2d 1173, 1179; *People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174, 1175.) If the language is clear, we must apply its plain and ordinary meaning; if it is unclear, we must also consider the purpose of the law and the "evils the statute seeks to remedy." (*Krawiec*, 262 Ill. App. 3d at 160, 634 N.E.2d at 1179; see *People v. Frieberg* (1992), 147 Ill. 2d 326, 349, 589 N.E.2d 508, 519.) The statute's legislative history may be useful in this determination. (*Krawiec*, 262 Ill. App. 3d at 160, 634 N.E.2d at 1179.) We believe that the "remaining present outside" language in the stalking statute requires judicial construction because its application is not clear and unambiguous.

The legislative intent in enacting the stalking statute was to prevent violent attacks by prohibiting conduct that may precede them. The statute was also intended to avert the terror, intimidation, and justifiable apprehension caused by the harassing conduct itself. (*Krawiec*, 262 Ill. App. 3d at 160, 634 N.E.2d at 1179; O'Reilly, *Illinois' Stalking Statute: Taking Unsteady Aim at Preventing Attacks*, 26 J. Marshall L. Rev. 821, 835 (1993) (hereinafter O'Reilly, *Illinois' Stalking Statute*).) Too often the obsession underlying the stalking behavior is a forewarning of future violence against the victims and their families. O'Reilly, *Illinois' Stalking Statute*, 26 J. Marshall L. Rev. at 836 & n.109 (listing highly publicized stalking incidents); Harmon, Comment, *Illinois' Newly Amended Stalking Law: Are All the Problems Solved?*, 19 S. Ill. U. L.J. 165, 168 & n.23 (1994) (hereinafter Harmon, *Amended Stalking Law*) (also listing highly publicized stalking incidents).

During legislative debate on the statute, Representative Lee Daniels summarized its significance by stating that it would send the message that "Illinois will not tolerate the stalking crime ever, ever again." (87th Ill. Gen. Assem., House Proceedings, May 20, 1992, at 80.) Representative Thomas Homer, House sponsor of the stalking bill, believed that the Illinois statute would be the toughest and most effective in the country and would serve as a model for the rest of the nation. 87th Ill. Gen. Assem., House Proceedings, May 20, 1992, at 72; 87th Ill. Gen. Assem., House Proceedings, June 23, 1992, at 7.

Legislators in both houses described recent instances in which young girls and women were repeatedly terrorized by stalkers because law enforcement officials could not act under existing Illinois laws until the victims were actually injured. (87th Ill. Gen. Assem., Senate Proceedings, May 21, 1992, at 61 (statements of Senator Adeline Geo-Karis); 87th Ill. Gen. Assem., Senate Proceedings, June 22, 1992, at 66 (statements of Senator Carl Hawkinson); 87th Ill. Gen. Assem., House Proceedings, May 20, 1992, at 69, 71-72 (statements of Representative Thomas Homer).) Representative Homer argued that the stalking statute was necessary because existing laws did not allow the police to "arrest someone who is merely—I say merely—threatening, following, harassing someone." (87th Ill. Gen. Assem., House Proceedings, June 26, 1992, at 156.) The stalking statute was designed in part to alleviate these problems.

During debate in the House, Representative Homer noted that the stalking statute would "provide a tool to law enforcement agencies that will allow them to [sic] the opportunity to save and protect some of these victims before it is too late." (87th Ill. Gen. Assem., House Proceedings, May 20, 1992, at 73.) Senator Hawkinson reiter-

ated this purpose during the Senate debate when he stated that the statute would allow the criminal justice system to intervene and prevent attacks. 87th Ill. Gen. Assem., Senate Proceedings, June 22, 1992, at 66.

■ With this purpose in mind, we construe the statutory requirement that the defendant place his victim under surveillance "by remaining present outside the *** other place occupied by the person" (720 ILCS 5/12—7.3(d) (West Supp. 1993)). This language does not require that defendant remain physically outside the building occupied by the victim, and the insertion of such a requirement would unduly restrict the scope of the statute, contrary to the legislative intent. Common sense dictates that a victim may be subjected to as much, or more, harassment by being placed under surveillance from within a separate portion of a large structure, such as a shopping mall or ice skating facility, as from outside such a structure.

The statute encompasses the surveillance of a person from a place within the same primary structure but distinct from the "other place occupied by the" person. The trial court properly determined that the scope of the stalking statute included defendant's surveillance of M.S. from a separate lobby and observation area adjoining the ice rink on which she skated.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the evidence in this case was insufficient to prove his guilt beyond a reasonable doubt. We examine this contention by considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 1027, 88 L. Ed. 2d 567, 106 S. Ct. 585.

### A

The defendant first contends that the evidence was insufficient to prove by a subjective standard that his conduct placed M.S. "in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint." To refute M.S.'s claim of subjective fear, defendant relies on the fact that she voluntarily returned to the ice rink after being frightened by seeing defendant there. We disagree.

M.S. testified at trial that she was frightened each time defendant appeared and stared at her from the area adjoining the ice rink. Evaluating the credibility of witnesses and resolving conflicting

testimony are functions of the fact finder, and a reviewing court may not override this determination unless these findings are unreasonable and not based on the evidence. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 261-62, 503 N.E.2d 277, 284, *cert. denied* (1987), 483 U.S. 1010, 97 L. Ed. 2d 745, 107 S. Ct. 3240; *Collins*, 106 Ill. 2d at 261-62, 478 N.E.2d at 277.) The trial court concluded that M.S.'s fear was genuine, and we will not reverse this finding on appeal.

■ Furthermore, the undisputed evidence shows that M.S. did not confront defendant at the ice rink. On each occasion M.S. was already skating during her reserved skating time when defendant arrived at the ice rink. It would be unreasonable and unfair to compel a stalking victim to demonstrate subjective fear by anticipating and actively avoiding places where the stalker might later appear.

**B**

The defendant also alleges that it was objectively illogical for M.S. to have continued to confront defendant at the ice rink if she feared him. After carefully reviewing the record, we cannot agree that M.S.'s apprehension was objectively unreasonable. Between August and December 1993, defendant had repeatedly stated to M.S. and others that he intended to "make it so that [M.S.] couldn't live in Peoria any more, and he threatened that [she] would have to deal with him the rest of [her] life, whether [she] married him or not."

M.S. testified that after breaking up with defendant she received 5 to 10 anonymous calls per day in which the caller either hung up when she answered or played recorded messages about sexually transmitted diseases. A tap on M.S.'s phone line showed that these calls were made from pay phones and fax machines throughout Peoria. The calls ended shortly after defendant discovered that a warrant had been issued for his arrest, but the calls gradually returned in January 1994. The trial court found that defendant had made as many as 200 prank telephone calls to M.S.

Defendant also sent M.S. several harassing postcards. In a postcard dated September 23, defendant wrote, "I'm doing what I got to do [*sic*] for myself and you. *** Ignoring me won't make me go away. It's just gonna [*sic*] make me try harder. *** I'm entitled to one more chance with you, and you get one more chance to rectify a mistake. You're gonna [*sic*] have to deal with me one way or another." In October, M.S. received a postcard with a horoscope clipping attached; the clipping read, "a relocation is possible. Apply for a passport. *** Romance seems sweeter the second time around." In November, M.S. received another postcard that stated, "The week of December 18 are finals at Bradley [University]. I'll help you move back up to Bar-

rington if you need the help. I'll talk to you soon." M.S. testified that she had no plans to move to Barrington Hills, Illinois, where her parents lived.

Defendant admitted preparing and delivering several small posters and bumper stickers containing M.S.'s name or photograph along with various references to venereal diseases. He stated that he intended these activities to force M.S. into leaving Peoria. During the week of Halloween 1993, defendant carved a jack-o'-lantern, smashed it, and left it on M.S.'s porch with a note declaring that M.S. had herpes. During this same time period, he left two notes in or taped to her mailbox; one was written in red and said, "Welcome back to hell," and the other was a moving notice from the post office. In early November, he also placed a sign reading, "Get your genital herpes here" on the yard of M.S.' parents' home in Barrington Hills.

■ Defendant's surveillance of M.S. at the skating rink occurred after this protracted harassment. An order of protection had been entered against defendant in December 1993, and he had been arraigned on two other stalking counts on January 27, 1994.

Based on this evidence, the trial court, as a rational finder of fact, could have determined that defendant's actions at the skating rink in February and March 1994 would have caused apprehension in a reasonable person. The evidence was sufficient to support the trial court's finding the statutory element of reasonable fear had been established.

## C

Defendant next argues that the evidence was insufficient to prove beyond a reasonable doubt that his presence at the skating rink was "without lawful justification" (720 ILCS 5/12—7.3(a) (West Supp. 1993)). Although defendant previously had not shown any interest in ice skating, he claims that watching ice hockey with a friend during the winter Olympics had inspired him to begin skating in February 1994. Defendant contends that his presence at the Owens Recreation Center was lawful because it was not a "manner of expression [that] is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford* (1972), 408 U.S. 104, 116, 33 L. Ed. 2d 222, 232, 92 S. Ct. 2294, 2303.

■ Defendant's argument overlooks the fact that he did not simply mind his own business and skate during the public skating session. Defendant could have arrived at the skating rink later or waited in another part of the facility for the start of the public skating period. Instead, he arrived well before the open skating period and stared at M.S. for up to 40 minutes during her private skating time on at least

four occasions. These events occurred after M.S. had obtained an order of protection against him and he had been arraigned on two other stalking counts. A rational fact finder could have inferred that defendant's presence at the ice rink was "without lawful justification" because he was there to stalk M.S. by placing her under surveillance.

## D

Defendant next argues that the evidence was insufficient to prove beyond a reasonable doubt that he "knowingly" placed M.S. "in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint." Because M.S. allegedly did not appear frightened of him and continued to return to the skating rink, defendant contends that a reasonable person could not have known that he had placed M.S. in apprehension of harm.

Defendant misapprehends the statute's knowledge requirement. Knowledge may be inferred from the facts and circumstances of the case. (*People v. Pinta* (1991), 210 Ill. App. 3d 1071, 1078, 569 N.E.2d 1255, 1260.) Knowledge of a material fact can include an awareness of the substantial probability that the fact exists or that specific conduct is practically certain to produce a given result. (720 ILCS 5/4—5 (West 1992); Illinois Pattern Jury Instructions, Criminal, Nos. 5.01B(1), (2) (3d ed. 1992).) Contrary to defendant's argument, the victim's behavior is not the determining factor in this analysis.

■ The victim's behavior in this case did, however, demonstrate her apprehension of defendant. Defendant knew that M.S. had previously obtained an order of protection against him and that he had been charged with two other counts of stalking based on his earlier threatening statements and harassing conduct. Even so, defendant chose to arrive at the skating rink well before the time set aside for public skating and stare at M.S. from the observation area. He did not talk to other people while waiting or attempt to wait in another part of the facility. Combined with defendant's prior conduct and his goal of forcing M.S. to leave Peoria, this evidence is sufficient to find a "substantial probability" that defendant knew his behavior placed M.S. in reasonable apprehension of harm.

## III. CONSTITUTIONALITY OF THE STATUTE

Defendant offers several grounds to support his claim that the stalking statute is unconstitutional. First, he argues that the statute is vague, both facially and in its application to him. He contends that the statute does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act

accordingly" (*Grayned*, 408 U.S. at 108, 33 L. Ed. 2d at 227, 92 S. Ct. at 2298-99) because the common understanding of the term "remaining present outside" does not include "remaining present inside." He also argues that the statute improperly grants law enforcement officials excessive discretion and allows for uneven application of the law.

## A

Statutes carry a strong presumption of constitutionality (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499, 431 N.E.2d 344, 352) and will be construed to avoid absurdity or invalidity (*People v. Wireman* (1989), 181 Ill. App. 3d 385, 388, 536 N.E.2d 1346, 1348). Vagueness claims against statutes that do not involve first amendment rights must be reviewed in the context of the specific case facts. (*People v. Haywood* (1987), 118 Ill. 2d 263, 270, 515 N.E.2d 45, 48, citing *United States v. Mazurie* (1975), 419 U.S. 544, 550, 42 L. Ed. 2d 706, 713, 95 S. Ct. 710, 714.) The stalking statute prohibits placing a person in reasonable apprehension of harm by "knowingly and without lawful justification" following or placing the person under surveillance on at least two occasions. (720 ILCS 5/12—7.3(a)(2) (West Supp. 1993).) Defendant fails to cite any authority stating that these activities are entitled to first amendment protection. Because the stalking statute does not involve first amendment rights, defendant cannot argue that it is facially vague.

■ A statute is unconstitutionally vague on its face only if it is "incapable of any valid application." (*Steffel v. Thompson* (1974), 415 U.S. 452, 474, 39 L. Ed. 2d 505, 523, 94 S. Ct. 1209, 1223.) A statute need not define the proscribed conduct with mathematical precision to avoid invalidation on vagueness grounds. (*Grayned v. City of Rockford* (1972), 408 U.S. 104, 110, 33 L. Ed. 2d 222, 228-29, 92 S. Ct. 2294, 2300.) Where a statute prohibits conduct "knowingly done with the purpose of doing that which" is prohibited, "the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is in violation of the law." (*Screws v. United States* (1945), 325 U.S. 91, 102, 89 L. Ed. 1495, 1503, 65 S. Ct. 1031, 1036; see also *People v. Tolliver* (1992), 147 Ill. 2d 397, 403, 589 N.E.2d 527, 530 (modifying statute making knowing possession of an incomplete car title a felony to require knowledge plus criminal purpose).) The stalking statute contains sufficiently objective standards of conduct and knowledge to allow its valid application: the victim's apprehension must be reasonable, and the specified conduct must have been performed "knowingly and without lawful justification" on at least two occasions.

## B

The stalking statute is also constitutional as applied to this defendant. A statute is not unconstitutionally vague simply because it allows some room for judicial interpretation. (*Grayned*, 408 U.S. at 110, 33 L. Ed. 2d at 228, 92 S. Ct. at 2300; *Easter Enterprises, Inc. v. Illinois Liquor Control Comm'n* (1983), 114 Ill. App. 3d 855, 859, 449 N.E.2d 1013, 1017.) The stalking statute adequately warns innocent persons of the conduct to be avoided: making threats, following, or placing someone under surveillance, and thereby reasonably producing intimidation, apprehension, and fear. Thus, the statute contains sufficiently clear standards to avoid arbitrary or discriminatory enforcement because it sets explicit, objective standards for defendant's actions, knowledge, and the effect of his conduct on his victim. (See *Grayned*, 408 U.S. at 108, 33 L. Ed. 2d at 227, 92 S. Ct. at 2298-99.) Unlike provisions invalidated on vagueness grounds in other cases, the stalking statute does not rely on strictly subjective standards and beliefs. (See *Coates v. City of Cincinnati* (1971), 402 U.S. 611, 611 n.1, 29 L. Ed. 2d 214, 216 n.1, 91 S. Ct. 1686, 1687 n.1 (invalidating an Ohio ordinance that made it illegal for "three or more persons to assemble *** on any of the sidewalks *** and there conduct themselves in a manner annoying to persons passing by").) The statute is not unconstitutionally vague either on its face or as it applies to defendant.

## C

Defendant next contends that the statute is overbroad because it prohibits constitutionally protected activity, such as ice skating. According to defendant, the question to be answered is "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." (*Grayned*, 408 U.S. at 116, 33 L. Ed. 2d at 232, 92 S. Ct. at 2303.) Because he was skating at a public ice rink during open skating times, defendant claims that his conduct was constitutionally protected and that his actions were not "without lawful justification."

■ Defendant again misapprehends the basis of his conviction. He was not convicted because of his ice skating, but rather because on at least two occasions he placed M.S. under surveillance during her reserved skating times. Defendant admitted at trial that his goal was to embarrass and annoy M.S.; these activities are not protected by the first amendment. (See Harmon, *Amended Stalking Law*, 19 S. Ill. U. L.J. at 181 & n.108, citing *Colten v. Kentucky* (1972), 407 U.S. 104, 109, 32 L. Ed. 2d 584, 589, 92 S. Ct. 1953, 1956 (actions taken solely to annoy and inconvenience are not given constitutional protection).) The statute is not overbroad as it applies to defendant.

The statute is also not facially overbroad. According to general principles of constitutional analysis,

> "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. [Citations.] A closely related principle is that constitutional rights are personal and may not be asserted vicariously[ ]" because "courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 610-11, 37 L. Ed. 2d 830, 839, 93 S. Ct. 2908, 2915.

However, parties may challenge a statute as overbroad "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612, 37 L. Ed. 2d at 840, 93 S. Ct. at 2916; see *People v. Holder* (1982), 103 Ill. App. 3d 353, 356, 431 N.E.2d 427, 430 ("[T]he mere fact that other applications of the statute in question, to other facts, can have impact on first amendment rights is sufficient to invalidate the statute regardless of whether the defendant has engaged in privileged conduct").

The courts have applied the overbreadth doctrine "sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could have been placed on the challenged statute." (*Broadrick*, 413 U.S. at 613, 37 L. Ed. 2d at 841, 93 S. Ct. at 2916.) A statute will not be deemed overbroad unless it has a significant effect on constitutionally protected activities. See *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 494, 71 L. Ed. 2d 362, 369, 102 S. Ct. 1186, 1191.

■ The stalking statute specifically exempts conduct protected by the first amendment, such as lawful picketing "or any exercise of the right of free speech or assembly that is otherwise lawful." (720 ILCS 5/12—7.3(c) (West Supp. 1993).) Although the statute is relatively broad, it does not substantially infringe upon constitutionally protected behavior or expression either generally or as applied to defendant.

## D

Defendant also argues that the statute improperly shifted the burden of proof to him because it forced him to defend his presence at the skating rink even though the State did not offer evidence that he was there with criminal intent and "without lawful justification."

■ After the State has presented a *prima facie* case of stalking, defendant may assert an "affirmative defense" by offering "evidence sufficient to raise a reasonable doubt as to [his] guilt." (*People v. Larry* (1986), 144 Ill. App. 3d 669, 676, 494 N.E.2d 1212, 1217, *appeal denied* (1986), 112 Ill. 2d 587; *People ex rel. Illinois State Dental Society v. Norris* (1979), 79 Ill. App. 3d 890, 897, 398 N.E.2d 1163, 1170.) The State, however, always retains the ultimate burden of proving defendant guilty beyond a reasonable doubt. The stalking statute does not alter this fundamental principle by impermissibly shifting the burden of proof to defendant.

■ Defendant's contention that the State failed to offer evidence that he was at the ice rink with criminal intent and without lawful justification is also incorrect. Intent may be inferred from the surrounding facts and circumstances, including defendant's acts and words. (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 148-49, 475 N.E.2d 606, 613, *appeal denied* (1985), 106 Ill. 2d 559.) The State offered evidence at trial of defendant's persistent harassment of M.S., his statements to third parties, his prior lack of interest in ice skating, and the filing of an order of protection and two previous stalking charges against him prior to the events at the Owens Recreation Center. When viewed in the light most favorable to the State, this evidence was sufficient to support a finding that defendant had the requisite criminal intent under the statute. See *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 1027, 88 L. Ed. 2d 567, 106 S. Ct. 585.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Peoria County is affirmed.

Affirmed.

HOLDRIDGE and SLATER, JJ., concur.