THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATSUO M. NAKAJIMA, Defendant-Appellant.

Fourth District   No. 4—97—0584

Argued January 27, 1998.—Opinion filed February 19, 1998.

W. Keith Davis (argued), of Jennings, Novick, Smalley & Davis, P.C., of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Jeffrey K. Davison (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Following a bench trial in February 1997, defendant, Matsuo Nakajima, was convicted of one count of stalking. 720 ILCS 5/12—7.3 (West 1994). In June 1997, the trial court entered judgment and ordered defendant to serve 180 days in jail, with 60 days served immediately and the balance stayed pending further review by the court. In addition, defendant was placed on 30 months' probation and directed to pay a $500 fine and seek psychological counseling. Defendant appeals, arguing (1) the stalking statute, as amended, is unconstitutional, and (2) the evidence was insufficient to prove him guilty of stalking beyond a reasonable doubt. For the following reasons, we affirm.

## I. BACKGROUND

In December 1995, a McLean County grand jury issued an indictment against defendant charging him with the stalking of Jennifer

Zanardi. The indictment alleged that, on October 25, 1995, and November 18, 1995, defendant knowingly and without lawful justification followed Jennifer in his vehicle and surveilled her outside her place of employment. The indictment further alleged defendant's conduct placed Jennifer in "reasonable apprehension of immediate or future bodily harm, sexual assault, or restraint."

At trial, Jennifer testified she first became acquainted with defendant, a Japanese national, in the fall of 1995. At that time, Jennifer lived with her parents in Normal, Illinois, and attended Illinois State University in Normal, Illinois. As part of her studies, she taught at Northpoint Elementary Grade School (Northpoint). She also worked part-time at Best Buy, an electronics store located in Bloomington.

Jennifer stated she had seen defendant six or seven times in Best Buy prior to October 24, 1995, and had assisted him on one or two of those occasions. She specifically recalled an instance when she assisted defendant with the purchase of an item. According to Jennifer, defendant had paid for the item with his credit card and, as she returned his card to him, he grabbed her hand. Jennifer stated this incident "scared" her because "nobody ha[d] ever touched [her] hand or done anything like that previously." She further described how defendant followed her throughout the store on several subsequent occasions. Based on the above events, Jennifer was "frightened" of defendant and became "concerned" with his behavior.

Jennifer testified that, on October 24, 1995, defendant followed her during her drive home from Northpoint. As Jennifer waited at the intersection of College Avenue and Veterans Parkway, she noticed defendant, alone, in a vehicle directly behind her. Jennifer proceeded through the intersection on College and defendant followed. According to Jennifer, defendant's vehicle was following "fairly closely" and remained directly behind her even when she made several lane changes. Jennifer turned off College onto a residential side street, and defendant continued to follow. She made several other turns and eventually lost sight of defendant. Jennifer stated that, although she was frightened when defendant was driving behind her, she was not overly concerned because she assumed he lived in the area.

Jennifer described a similar encounter as she drove home from Northpoint the following day, October 25. She again recognized defendant's vehicle directly behind her as she waited at the intersection of College and Veterans. When Jennifer recognized defendant, she became scared. Jennifer drove on College and defendant proceeded behind her. She turned on Blair Street, while defendant turned down Orr, the street immediately before Blair. Jennifer stated

she became relieved when defendant did not follow and again assumed he lived in the area. However, as Jennifer approached the intersection of Blair and Spear Streets, she again saw defendant's vehicle. She proceeded down several different streets while defendant followed. Jennifer described how defendant cut across traffic to stay behind her when she turned and remained no more than two car lengths behind her vehicle. She estimated this incident lasted 15 to 20 minutes and stated that, during certain intervals, both vehicles were traveling about 60 miles per hour.

Jennifer testified she was "absolutely terrified" of defendant during the above incident. She did not know what defendant intended or why he was following her. According to Jennifer, she "wanted to get to a safe place" and did not stop "because [she] didn't know if he would try to harm [her] in any way." Jennifer believed defendant intended to cause her bodily harm.

After eluding defendant, Jennifer stopped briefly at home and then went to work at Best Buy. Jennifer telephoned her father, Michael Zanardi, upon arriving at the store and described the incident involving defendant. She additionally asked Michael if he would meet her at the store after closing. Jennifer finished work about 10 p.m. and met Michael immediately outside the store's entrance shortly thereafter. Upon exiting, Jennifer noticed defendant's vehicle parked in the store's parking lot. Jennifer identified the vehicle to Michael and walked to her vehicle with store security.

Jennifer next saw defendant on November 4, 1995. About 2 p.m. that afternoon, Jennifer was driving to a friend's house and noticed her parents and defendant at the intersection of Vernon and Grandview. This intersection is about a half mile from the Zanardi residence. Jennifer stated she stopped and saw Michael and defendant talking outside their vehicles. Jennifer remained in her car throughout the duration of her father's conversation with defendant.

Jennifer saw defendant again on November 18, 1995. At 10 p.m., Jennifer went to Best Buy with a friend to pick up her car and saw defendant driving his vehicle up and down the aisles of the parking lot. She estimated defendant drove in this manner for one or two minutes and then parked a few spots from where her vehicle was located. Jennifer entered Best Buy and telephoned the police. She filed a complaint with the police later that night.

Michael testified that, prior to October 25, 1995, Jennifer was concerned with a Japanese man who was a frequent customer at Best Buy. Michael additionally testified concerning the events of October 25 and November 4. He stated that, on October 25, Jennifer telephoned him and described the incidents that occurred as she

drove home from Northpoint. Michael described Jennifer as "very agitated, very upset, [and] very frightened" during the telephone call. Michael met Jennifer later that night at Best Buy. Upon Michael's arrival at the store, Jennifer pointed out defendant's vehicle. Michael drove beside the vehicle and talked with defendant. According to Michael, he asked defendant why he was in the parking lot, and defendant stated he was waiting for an individual who was in one of the stores. Michael asked defendant which store because, at that time, all the stores were closed. Michael identified himself as Jennifer's father and discussed the incidents of October 24 and 25, as well as Jennifer's concerns that had developed over the previous month. He told defendant to stay away from Jennifer and informed him the police would be notified if his conduct continued. Michael maintained defendant stated he intended no harm and apologized several times for his behavior.

Michael further testified that, on November 4, 1995, he saw defendant's vehicle parked at the intersection of Vernon and Blair. He related that other family members previously had seen defendant's vehicle at this location. The intersection at Vernon and Blair is about eight residential lots from the Zanardi residence. Michael described that, as he approached the intersection, defendant drove off on Vernon at a "rather rapid rate." Michael followed and ultimately cut in front of defendant's vehicle, forcing it to the side of the road. Michael exited his vehicle and talked to defendant. He asked defendant why he continued to harass his family. He further told defendant that the police and State's Attorney's office had been informed of his conduct. According to Michael, defendant acknowledged he had received a letter from the State's Attorney dated November 1, 1995. Michael stated defendant again apologized for his behavior.

David Goodman and Michael Alcorn, officers with the Bloomington police department, testified concerning the evening of October 25. Goodman stated he was dispatched to Best Buy about 10 p.m. Upon arriving at the store, Goodman saw Jennifer, her father and defendant in the parking lot. Goodman asked defendant why he was in the parking lot, and defendant responded he was waiting for a friend who was at the movie theater next to Best Buy. Goodman asked defendant the friend's name and which movie the friend was seeing, but defendant failed to provide this information.

Alcorn also testified as to conversations he had with defendant on the evening of October 25. Alcorn stated that he explained the nature of Jennifer's complaint to defendant and informed him that his behavior would be classified as disorderly conduct and possibly stalking. Defendant maintained he was waiting for a friend he identified

as Jeff. Alcorn asked Jeff's last name, but defendant stated he did not know that information. Alcorn further asked of Jeff's whereabouts. Defendant pointed to Ducky's, a formal wear store located near the movie theater, and stated Jeff recently had left in another vehicle. Alcorn informed defendant a report would be sent to the State's Attorney's office, and, if similar incidents had occurred, his conduct could be construed as stalking. Alcorn stated defendant apologized several times to Jennifer's father and maintained "he didn't want any problems." Both officers testified they informed defendant of Jennifer's concerns and stated he should not continue to follow her or any other members of the Zanardi family.

Dale Sparks testified he was a police officer who responded to a "911" call on November 4, 1995. When Sparks arrived at the intersection of Vernon and Grandview, he was informed that defendant was following members of the Zanardi family. Sparks asked defendant why he was in the area, and defendant responded he was taking photographs of the fall colors. Sparks stated he did not see a camera in defendant's possession. He told defendant not to trouble the Zanardi family and specifically discussed the letter defendant received from the State's Attorney's office. Defendant informed Sparks he intended to respond to this letter.

Todd Williams, a Bloomington police officer, testified he investigated Jennifer's 911 call on November 18, 1995. Williams spoke with Jennifer and was told that an Asian man had been following her that night and on several previous occasions. According to Williams, Jennifer explained the man was standing near her car and immediately left the area when she made eye contact with him. He testified Jennifer indicated she was "very scared of this individual and wished that the gentleman would stop following her." Williams never identified the man described by Jennifer.

Defendant testified as the sole defense witness. He stated he had shopped at Best Buy on numerous occasions prior to October 24, 1995, and was familiar with Jennifer in her capacity as a store employee. Defendant stated on one occasion he used his credit card to make a purchase but does not recall grabbing Jennifer's hand per her testimony. In addition, defendant denied following Jennifer on both October 24 and 25. In regard to the evening of October 25, defendant explained he was in the parking lot waiting for a man he knew as Jeff to exit the movie theater. According to defendant, he had met Jeff and his wife earlier that day in a restaurant. Jeff wanted to see a movie, and defendant offered to pick him up when the movie ended since Jeff's wife was not available. Defendant stated he did not know Jeff's surname. Defendant stated that the wife picked up Jeff while

he was talking to Officers Goodman and Alcorn. Defendant acknowledged he was told to stay away from Jennifer by the officers and Michael but denied apologizing for his behavior.

Defendant also related the events of November 4, 1995. Defendant maintained he stopped momentarily at the intersection of Blair and Vernon and then continued on Vernon. He described how Michael pulled up behind his vehicle and forced him to the curb. Defendant talked to Michael and explained he was in the area taking photographs of the fall colors. Defendant testified he was never told by Michael that he was frightening Jennifer or that he should refrain from following her. He additionally denied apologizing for his behavior and did not understand why this information was reflected in the police report.

Defendant believed he acted "quite normally" and did not understand why his behavior would have caused Jennifer to fear for her safety. Defendant stated he never threatened Jennifer or any other member of her family and maintained he never intended to cause Jennifer harm. He expressed remorse for any trouble his behavior might have caused the Zanardi family.

In addition to the testimonies detailed above, the record contains a copy of the letter sent by the McLean County State's Attorney and defendant's reply letter. The letter from the State's Attorney office, dated November 1, 1995, informed defendant that the office had received a report from the Bloomington police department concerning a "young lady" that defendant had been "following and harassing." The letter further informed defendant that his "behavior has been extremely upsetting to the young lady involved, as well as her family," and, if continued, would result in criminal prosecution. Defendant, in a letter received by the State's Attorney's office on November 7, 1995, assured that his conduct would cease immediately.

At the close of the parties' cases, the trial court took the matter under advisement and, on February 28, 1997, heard closing remarks. The trial court ultimately found defendant guilty of the offense of stalking. In June 1997, the trial court sentenced defendant to 180 days in jail, with 60 days served immediately, and ordered him to serve 30 months' probation, pay a $500 fine, and undergo psychological counseling. In April 1997, defendant filed a posttrial motion requesting the trial court to vacate his conviction or, in the alternative, order a new trial. The trial court denied the motion in June 1997, and this appeal followed.

## II. ANALYSIS

### A. Constitutional Challenge to Stalking Statute

■ Defendant was convicted under section 12—7.3 of the Crimi-

nal Code of 1961, which became effective August 18, 1995, and reads, in relevant part:

> "(a) A person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and:
>
>> (1) at any time transmits a threat to that person of immediate or future bodily harm, sexual assault, confinement or restraint; or
>>
>> (2) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint." 720 ILCS 5/12—7.3 (West 1994).

■ Defendant initially challenges the constitutionality of the stalking statute. We stress that a statute enjoys a strong presumption of constitutionality. *People v. Warren*, 173 Ill. 2d 348, 355, 671 N.E.2d 700, 704-05 (1996). In addressing a question of constitutionality, we must ascertain and give effect to the legislature's intent in enacting the statute. Furthermore, we must construe the statute so as to sustain its constitutionality and presume any interpretation that renders the law valid was intended by the legislature. *People v. Bailey*, 167 Ill. 2d 210, 225, 657 N.E.2d 953, 960-61 (1995).

■ The purpose of the stalking statute is to protect against the fear and violence associated with predatory and uninvited conduct. In enacting the statute, the legislature sought "to prevent violent attacks by prohibiting conduct that may precede them." *People v. Holt*, 271 Ill. App. 3d 1016, 1021, 649 N.E.2d 571, 577 (1995). The legislature additionally intended to "avert the terror, intimidation, and justifiable apprehension caused by the harassing conduct itself." *Holt*, 271 Ill. App. 3d at 1021, 649 N.E.2d at 577. In realizing such conduct is often a precursor to future violence, the statute allows law enforcement authorities to act before a victim is actually injured.

■ Defendant first argues section 12—7.3 is void for vagueness and overbreadth. Defendant maintains *Bailey* resolved these issues contrary to his position and that he raises them here solely to avoid waiver. As defendant contends, the court in *Bailey* found the stalking statute neither unconstitutionally vague nor overly broad. However, the court resolved these issues strictly within the context of the pre-1993 version of the statute and not within the context of the current legislation. *Bailey*, 167 Ill. 2d at 223, 657 N.E.2d at 960. Thus, *Bailey* is not dispositive here, and defendant is not precluded from challenging the constitutionality of the statute on these grounds. Nevertheless, because defendant has failed to provide sufficient argument or relevant authority in support of his position, we deem these issues

waived. 155 Ill. 2d R. 341(e)(7); *People v. Dinger*, 136 Ill. 2d 248, 254, 554 N.E.2d 1376, 1378 (1990).

■ Defendant further focuses his constitutional challenge on subsection (a)(2), which requires that the accused's conduct place the victim in reasonable apprehension of "bodily harm, sexual assault, confinement or restraint." 720 ILCS 5/12—7.3(a)(2) (West 1994). Defendant contends, because subsection (a)(2) does not require the accused to knowingly place the victim in reasonable apprehension of the specified conduct, the statute imposes criminal liability absent proof of a particular mind state. As such, defendant argues the statute violates his due process rights guaranteed under the Illinois and federal constitutions.

Defendant's argument has been rejected in *People v. Cortez*, 286 Ill. App. 3d 478, 676 N.E.2d 195 (1996), and *People v. Rand*, 291 Ill. App. 3d 431, 439, 683 N.E.2d 1243, 1248 (1997). In *Cortez*, the defendant argued the current version of the stalking statute was unconstitutionally overbroad because no mental state, such as knowledge, accompanied either subsection (a)(1) or (a)(2). As a result, defendant argued the statute encompassed innocent conduct. In disagreeing with the defendant's contention, the court noted if the statute in question prescribes " 'a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element.' " *Cortez*, 286 Ill. App. 3d at 481, 676 N.E.2d at 198, quoting 720 ILCS 5/4—3(b) (West 1994). The court read the terms "knowingly" and "without lawful authority" as modifying not only the acts of following and surveilling, but the conduct described in subelements (a)(1) and (a)(2) as well. On this basis, the court determined the statute proscribes only culpable conduct. *Cortez*, 286 Ill. App. 3d at 481, 676 N.E.2d at 198; see also *Rand*, 291 Ill. App. 3d at 438, 683 N.E.2d at 1247 (same). We agree with the holdings of *Cortez* and *Rand* and likewise read a culpability requirement in subsection (a)(2). Accordingly, we find the current stalking legislation constitutional.

## B. Sufficiency of Evidence

■ Defendant next contends the evidence is insufficient to support his conviction for stalking. In considering a challenge to the sufficiency of the evidence, the relevant inquiry is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Brown*, 169 Ill. 2d 132, 152, 661 N.E.2d 287, 296 (1996). A defendant's conviction will not be overturned on review unless the fact finder's verdict is so improbable,

unreasonable, or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. In a bench trial, a reviewing court will respect the weight given by the trial judge to the witnesses' testimonies, their credibility and the reasonable inferences drawn from the evidence. *People v. Kitchen*, 159 Ill. 2d 1, 25, 636 N.E.2d 433, 443-44 (1994).

Defendant argues his conviction must be reversed because Jennifer's testimony fails to show she was twice placed in reasonable apprehension of bodily harm, assault, confinement or restraint. According to defendant, the plain language of the statute requires the State to establish two incidents in which the accused's acts of following or surveillance placed the victim in apprehension of the specified misconduct. In other words, defendant urges each act of following or surveillance must be accompanied by a particular apprehension in the victim.

As a primary rule of statutory construction, we must ascertain and give effect to the intent of the legislature. In determining the legislature's intent, we must read the statute as a whole and consider all relevant parts. *People v. Lewis*, 158 Ill. 2d 386, 389, 634 N.E.2d 717, 719 (1994). Aside from the specific wording of the statute, we may also focus on the "reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *People v. Frieberg*, 147 Ill. 2d 326, 345, 589 N.E.2d 508, 517 (1992).

Pursuant to the above guidelines, we construe the stalking statute to require two separate instances where the victim is placed in reasonable apprehension of bodily harm, sexual assault, confinement or restraint. As employed in the statute, the phrase "on at least 2 separate occasions" relates not only to the acts of following and surveilling, but also the particular apprehension felt by the victim. 720 ILCS 5/12—7.3(a) (West 1994). Significantly, subsection (a)(2) does not contain a temporal reference like subsection (a)(1), which provides that the accused's threat can be transmitted "at any time" (720 ILCS 5/12—7.3(a)(1) (West 1994)). Consequently, the accused's conduct, at a minimum, must twice place the victim in reasonable apprehension of the misconduct listed in subsection (a)(2). We, however, do not interpret the statute to require that such apprehension stem from the accused's acts of following or surveillance. A showing that the victim's fears arose apart and separate from the requisite acts of following and surveillance would be sufficient under the statute. Such a showing naturally involves consideration of the time frame in which the accused's actions occurred, and a determination as to whether a sufficient temporal proximity exists between the acts of following and surveillance and the victim's apprehension would be

within the province of the trier of fact. Our reading of the statute is consistent with the legislature's purpose of deterring particular patterns of harassing conduct.

■ Contrary to defendant's assertion, Jennifer was not required to expressly testify about her apprehension. Subsection (a)(2) essentially sets forth the traditional definition of assault. See *People v. Zamudio*, 293 Ill. App. 3d 976, 982 (1997). As such, the determination of whether the victim was placed in reasonable apprehension of "bodily harm, sexual assault, confinement or restraint" will be judged by an objective standard. The victim, therefore, need not testify explicitly about his or her apprehension. Rather, the trier of fact may reasonably infer such apprehension from the facts and circumstances of the case. See *People v. Enerson*, 202 Ill. App. 3d 748, 749-50, 559 N.E.2d 801, 803 (1990) ("[i]t is not necessary that the victim expressly testify that he was in apprehension of a battery to sustain a conviction [for criminal assault]; rather, it can be shown inferentially based on the conduct of the defendant and the victim"); accord *People v. Ferguson*, 181 Ill. App. 3d 950, 953, 537 N.E.2d 880, 882 (1989); *People v. Burrows*, 64 Ill. App. 3d 764, 766, 381 N.E.2d 1040, 1042 (1978).

Upon review of the record, we conclude the evidence adequately supports the trial court's finding that Jennifer was placed in reasonable apprehension of bodily harm as a result of defendant's conduct. At all relevant times, Jennifer knew defendant only in her capacity as a Best Buy employee. She specifically recalled an instance when defendant grabbed her hand in an unusual manner and testified that defendant's behavior thereafter "frightened" and "concerned" her. In addition, Jennifer testified that defendant followed her in her vehicle on two occasions as she drove home from teaching. On one of these occasions, Jennifer stated she was "absolutely terrified" of defendant and believed defendant intended to harm her. A short time after the second following incident, defendant was seen sitting in his vehicle immediately outside Jennifer's place of employment. Upon noticing defendant, Jennifer felt the need to be escorted by store security to her car. Jennifer saw defendant near her home about a week and a half later, and she saw him again parked outside Best Buy on November 18. On the latter occasion, Jennifer notified the police and filed a formal criminal complaint against defendant. The trial court, as trier of fact, was primarily responsible for evaluating the credibility of the witnesses and resolving any conflicts in their testimony. *People v. Sanchez*, 115 Ill. 2d 238, 261-62, 503 N.E.2d 277, 284 (1986). As such, the trial judge was not required to accept defendant's version of events. Given the totality of the circumstances, the trial court

properly found that defendant's persistent and unwelcome conduct placed Jennifer in reasonable apprehension of bodily harm.

■ In the alternative, defendant argues the evidence fails to show he subjectively knew his behavior caused Jennifer's apprehension. As previously mentioned, subsection (a)(2) requires a showing that the accused "knowingly" placed the victim in reasonable apprehension of "bodily harm, sexual assault, confinement, or restraint." 720 ILCS 5/12—7.3(a)(2) (West 1994). The accused's knowledge may be inferred from the facts and circumstances of the case (*Holt*, 271 Ill. App. 3d at 1025, 649 N.E.2d at 579), and the accused need not admit he possesses knowledge for the trier of fact to draw such a conclusion (*People v. Rader*, 272 Ill. App. 3d 796, 806, 651 N.E.2d 258, 265 (1995)). "Knowledge of a material fact can include an awareness of the substantial probability that the fact exists or that specific conduct is practically certain to produce a given result." *Holt*, 271 Ill. App. 3d at 1025, 649 N.E.2d at 579, citing 720 ILCS 5/4—5 (West 1992), and Illinois Pattern Jury Instructions, Criminal, Nos. 5.01B(1), (2) (3d ed. 1992).

In light of the evidence already discussed by the court, we find defendant "knowingly" placed Jennifer in apprehension of bodily harm. In addition, we note there was evidence that, on several occasions, defendant was explicitly told of Jennifer's concerns and ordered to stay away from her and other members of the Zanardi family. Defendant received a letter from the State's Attorney's office detailing the effect of his actions on Jennifer and advising that he would be criminally prosecuted if his conduct did not cease. The trial court could have properly inferred defendant's knowledge for purposes of subsection (a)(2).

Based on the above, we conclude a rational trier of fact could have found defendant guilty of stalking beyond a reasonable doubt.

## III. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction.

Affirmed.

KNECHT and STEIGMANN, JJ., concur.