No. 4-97-0584

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Ap­peal from 

Plaintiff-Appellee, ) Circuit Court of 

v. ) McLean County

MATSUO M. NAKAJIMA, ) No. 95CF1107

Defendant-Appellant. )

) Honorable

) Michael G. Prall,

) Judge Presid­ing.

_________________________________________________________________

JUSTICE GARMAN delivered the opinion of the court:

Following a bench trial in February 1997, defendant, Matsuo Nakajima, was convicted of one count of stalking.  720 ILCS 5/12-7.3 (West 1994).  In June 1997, the trial court en­tered judgment and ordered defen­dant to serve 180 days in jail, with 60 days served immediately and the balance stayed pending further review by the court.  In addition, defen­dant was placed on 30 months' probation and directed to pay a $500 fine and seek psy­cho­log­ical counseling.  Defendant appeals, arguing (1) the stalk­ing statute, as amend­ed, is unconstitutional, and (2) the evi­dence was insufficient to prove him guilty of stalking beyond a rea­son­able doubt.  For the following reasons, we affirm.

I.  BACKGROUND

In December 1995, a McLean County grand jury issued an indictment against defendant charging him with the stalk­ing of Jennifer Zanardi.  The in­dictment al­leged that, on October 25, 1995, and November 18, 1995, de­fen­dant know­ingly and with­out law­ful jus­tifi­ca­tion fol­lowed Jennifer in his vehi­cle and surveilled her out­side her place of em­ploy­ment.  The indict­ment fur­ther alleged defendant's conduct placed Jennifer in "reasonable appre­hension of immediate or fu­ture bodi­ly harm, sexual assault, or re­straint."  

At trial, Jennifer testified she first became ac­quaint­ed with defendant, a Japanese national, in the fall of 1995.  At that time, Jennifer lived with her parents in Normal, Illinois, and attended Illinois State University in Normal, Illinois.  As part of her studies, she taught at Northpoint Elementary Grade School (Northpoint).  She also worked part-time at Best Buy, an elec­tronics store located in Bloomington.

Jennifer stated she had seen de­fendant six or seven times in Best Buy prior to Octo­ber 24, 1995, and had assisted him on one or two of those occasions.  She specifi­cally recalled an in­stance when she assisted defendant with the purchase of an item.  According to Jennifer, defendant had paid for the item with his credit card and, as she returned his card to him, he grabbed her hand.  Jennifer stated this incident "scared" her because "nobody ha[d] ever touched [her] hand or done anything like that previously."  She further described how defendant fol­lowed her throughout the store on several subse­quent occasions.  Based on the above events, Jennifer was "frightened" of defendant and became "concerned" with his behavior.

Jennifer testified that, on October 24, 1995, defen­dant followed her during her drive home from Northpoint.  As Jennifer wait­ed at the in­ter­sec­tion of Col­lege Ave­nue and Vet­er­ans Park­way, she no­ticed de­fen­dant, alone, in a vehicle di­rect­ly be­hind her.  Jennifer pro­ceeded through the inter­section on Col­lege and de­fen­dant fol­lowed.  Ac­cord­ing to Jennifer, defendant's vehi­cle was follow­ing "fairly close­ly" and remained directly behind her even when she made several lane changes.  Jennifer turned off College onto a resi­dential side street, and de­fen­dant con­tin­ued to fol­low.  She made several other turns and eventually lost sight of de­fen­dant.  Jennifer stat­ed that, although she was fright­ened when de­fen­dant was driving behind her, she was not over­ly con­cerned because she as­sumed he lived in the area.

Jennifer described a similar encounter as she drove home from Northpoint the following day, October 25.  She again rec­og­nized defendant's vehi­cle di­rect­ly be­hind her as she waited at the inter­section of College and Vet­er­ans.  When Jennifer rec­ognized defendant, she became scared.  Jennifer drove on College and defendant proceeded behind her.  She turned on Blair Street, while de­fen­dant turned down Orr, the street immedi­ately before Blair.  Jennifer stated she became relieved when defendant did not follow and again as­sumed he lived in the area.  However, as Jennifer ap­proached the inter­section of Blair and Spear Streets, she again saw defendant's vehicle.  She pro­ceeded down sev­er­al dif­fer­ent streets while defendant fol­lowed.  Jennifer described how de­fen­dant cut across traffic to stay be­hind her when she turned and re­mained no more than two car lengths behind her vehi­cle.  She esti­mated this inci­dent last­ed 15 to 20 min­utes and stat­ed that, during certain inter­vals, both vehi­cles were trav­el­ing about 60 miles per hour. 

Jennifer testified she was "absolutely terrified" of defendant during the above incident.  She did not know what de­fendant intended or why he was following her.  Ac­cording to Jennifer, she "wanted to get to a safe place" and did not stop "because [she] didn't know if he would try to harm [her] in any way."  Jennifer be­lieved de­fen­dant intended to cause her bodily harm.

After eluding defendant, Jennifer stopped briefly at home and then went to work at Best Buy.  Jennifer telephoned her fa­ther, Mi­chael Zanardi, upon ar­riv­ing at the store and de­scribed the inci­dent involving de­fen­dant.  She additionally asked Mi­chael if he would meet her at the store after closing.  Jennifer fin­ished work about 10 p.m. and met Mi­chael immediately outside the store's entrance shortly there­af­ter.  Upon exit­ing, Jennifer no­ticed defendant's vehi­cle parked in the store's park­ing lot.  Jennifer identified the vehi­cle to Mi­chael and walked to her vehicle with store security.

Jennifer next saw defendant on November 4, 1995.  About 2 p.m. that afternoon, Jennifer was driving to a friend's house and no­ticed her parents and de­fendant at the in­ter­sec­tion of Vernon and Grandview.  This intersection is about a half mile from the Zanardi residence.  Jennifer stated she stopped and saw Michael and defendant talking outside their vehicles.  Jennifer remained in her car throughout the duration of her fa­ther's con­ver­sation with defendant.

Jennifer saw defendant again on November 18, 1995.  At 10 p.m., Jennifer went to Best Buy with a friend to pick up her car and saw defendant driving his vehi­cle up and down the aisles of the parking lot.  She estimated defen­dant drove in this man­ner for one or two minutes and then parked a few spots from where her vehicle was located.  Jennifer entered Best Buy and tele­phoned the po­lice.  She filed a complaint with the police later that night.

Michael testified that, prior to Octo­ber 25, 1995, Jennifer was concerned with a Japanese man who was a frequent customer at Best Buy.  Mi­chael addi­tion­ally tes­ti­fied con­cern­ing the events of Octo­ber 25 and No­vem­ber 4.  He stat­ed that, on Octo­ber 25, Jennifer tele­phoned him and de­scribed the inci­dents that oc­curred as she drove home from Northpoint.  Michael de­scribed Jennifer as "very agi­tat­ed, very up­set, [and] very fright­ened" during the telephone call.  Michael met Jennifer later that night at Best Buy.  Upon Michael's arrival at the store, Jennifer pointed out defendant's vehicle.  Michael drove beside the vehi­cle and talked with de­fen­dant.  Ac­cord­ing to Mi­chael, he asked de­fen­dant why he was in the parking lot, and de­fen­dant stat­ed he was wait­ing for an indi­vidual who was in one of the stores.  Michael asked defen­dant which store be­cause, at that time, all the stores were closed.  Michael iden­tified him­self as Jennifer's father and discussed the inci­dents of Octo­ber 24 and 25, as well as Jennifer's con­cerns that had devel­oped over the previ­ous month.  He told defen­dant to stay away from Jennifer and in­formed him the police would be notified if his conduct contin­ued.  Michael maintained defendant stated he in­tend­ed no harm and apologized sev­er­al times for his behavior.

Michael further testified that, on November 4, 1995, he saw defendant's vehicle parked at the intersection of Vernon and Blair.  He related that other family members previously had seen defendant's vehicle at this location.  The in­ter­sec­tion at Vernon and Blair is about eight residential lots from the Zanardi resi­dence.  Michael described that, as he ap­proached the in­ter­sec­tion, de­fen­dant drove off on Vernon at a "rath­er rapid rate."  Michael fol­lowed and ultimately cut in front of defendant's vehi­cle, forc­ing it to the side of the road.  Mi­chael exited his vehicle and talked to de­fen­dant.  He asked de­fen­dant why he con­tin­ued to harass his family.  He further told defendant that the po­lice and State's Attorney's office had been informed of his conduct.  According to Michael, de­fen­dant ac­knowl­edged he had re­ceived a let­ter from the State's At­torney dated November 1, 1995.  Michael stated de­fen­dant again apolo­gized for his be­hav­ior.

David Goodman and Michael Alcorn, officers with the Bloomington po­lice de­part­ment, tes­ti­fied concerning the evening of Octo­ber 25.  Goodman stated he was dispatched to Best Buy about 10 p.m.  Upon arriving at the store, Goodman saw Jennifer, her fa­ther and de­fen­dant in the parking lot.  Goodman asked de­fendant why he was in the park­ing lot, and defendant responded he was waiting for a friend who was at the movie theater next to Best Buy.  Good­man asked defendant the friend's name and which movie the friend was seeing, but defen­dant failed to provide this in­forma­tion.

Alcorn also testified as to conversations he had with de­fen­dant on the eve­ning of Octo­ber 25.  Alcorn stated that he ex­plained the nature of Jennifer's complaint to defendant and in­formed him that his behavior would be clas­si­fied as dis­or­derly con­duct and pos­si­bly stalking.  Defendant maintained he was wait­ing for a friend he identified as Jeff.  Alcorn asked Jeff's last name, but defendant stated he did not know that in­formation.  Alcorn fur­ther asked of Jeff's whereabouts.  Defendant pointed to Ducky's, a formal wear store located near the movie theater, and stated Jeff recently had left in another vehicle.  Alcorn in­formed de­fendant a report would be sent to the State's Attorney's office, and, if similar incidents had occurred, his con­duct could be con­strued as stalk­ing.  Alcorn stated defendant apologized several times to Jennifer's father and maintained "he didn't want any prob­lems."  Both offi­cers tes­ti­fied they in­formed de­fen­dant of Jennifer's concerns and stated he should not continue to fol­low her or any other members of the Zanardi family.

Dale Sparks testified he was a police officer who re­sponded to a "911" call on November 4, 1995.  When Sparks arrived at the intersection of Vernon and Grandview, he was in­formed that de­fen­dant was fol­low­ing mem­bers of the Zanardi fami­ly.  Sparks asked defen­dant why he was in the area, and de­fendant responded he was tak­ing photo­graphs of the fall colors.  Sparks stated he did not see a camera in defendant's possession.  He told defen­dant not to trou­ble the Zanardi family and specifically dis­cussed the let­ter de­fendant received from the State's Attorney's office.  De­fendant informed Sparks he in­tend­ed to respond to this letter.

Todd Williams, a Bloomington police officer, testified he investigated Jennifer's 911 call on November 18, 1995.  Wil­liams spoke with Jennifer and was told that an Asian man had been following her that night and on several previous occasions.  Ac­cord­ing to Wil­liams, Jennifer explained the man was standing near her car and immediately left the area when she made eye con­tact with him.  He testified Jennifer indicated she was "very scared of this individual and wished that the gentleman would stop fol­low­ing her."  Wil­liams never iden­ti­fied the man de­scribed by Jennifer.

Defendant testified as the sole defense witness.  He stated he had shopped at Best Buy on nu­mer­ous occasions prior to October 24, 1995, and was familiar with Jennifer in her capacity as a store employee.  Defendant stated on one occasion he used his credit card to make a purchase but does not recall grabbing Jennifer's hand per her testimony.  In addition, de­fen­dant de­nied fol­low­ing Jennifer on both October 24 and 25.  In regard to the evening of October 25, defendant ex­plained he was in the park­ing lot waiting for a man he knew as Jeff to exit the movie theater.  According to defendant, he had met Jeff and his wife earlier that day in a res­tau­rant.  Jeff wanted to see a movie, and defen­dant of­fered to pick him up when the movie ended since Jeff's wife was not avail­able.  De­fen­dant stated he did not know Jeff's surname.  Defendant stated that the wife picked up Jeff while he was talk­ing to Offi­cers Good­man and Alcorn.  De­fen­dant ac­knowl­edged he was told to stay away from Jennifer by the officers and Michael but de­nied apologizing for his behav­ior.

Defendant also related the events of November 4, 1995.  Defendant maintained he stopped momentarily at the intersection Blair and Vernon and then continued on Vernon.  He described how Mi­chael pulled up behind his vehicle and forced him to the curb.  Defen­dant talked to Michael and explained he was in the area taking photographs of the fall colors.  Defendant testified he was never told by Michael that he was frightening Jennifer or that he should refrain from following her.  He addition­al­ly de­nied apol­o­giz­ing for his be­hav­ior and did not understand why this information was reflected in the police report.

Defendant believed he acted "quite normally" and did not understand why his behavior would have caused Jennifer to fear for her safe­ty.  Defendant stated he never threat­ened Jennifer or any other member of her family and maintained he never in­tend­ed to cause Jennifer harm.  He expressed re­morse for any trouble his behavior might have caused the Zanardi family.

In addition to the testimonies detailed above, the record contains a copy of the letter sent by the McLean County State's At­torney and defendant's reply letter.  The letter from the State's Attorney office, dated November 1, 1995, informed defendant that the office had received a report from the Bloomington police department concerning a "young lady" that de­fendant had been "following and harassing."  The let­ter fur­ther in­formed de­fen­dant that his "be­hav­ior has been ex­tremely upset­ting to the young lady in­volved, as well as her family," and, if con­tinued, would result in crim­i­nal pros­ecu­tion.  De­fen­dant, in a letter received by the State's Attorney's office on No­vem­ber 7, 1995, as­sured that his con­duct would cease imme­diate­ly.

At the close of the parties' cases, the trial court took the mat­ter under ad­vise­ment and, on February 28, 1997, heard closing remarks.  The trial court ultimately found defen­dant guilty of the offense of stalking.  In June 1997, the trial court sentenced defendant to 180 days in jail, with 60 days served imme­di­ate­ly, and ordered him to serve 30 months' proba­tion, pay a $500 fine, and undergo psychologi­cal counsel­ing.  In April 1997, defendant filed a posttrial motion requesting the trial court to vacate his con­vic­tion or, in the alternative, order a new tri­al.  The trial court denied the motion in June 1997, and this ap­peal followed.

II.  ANALYSIS

A.  Constitutional Challenge to Stalking Statute

Defendant was convicted under section 12-7.3 of the Crim­i­nal Code of 1961, which became effective August 18, 1995, and reads, in relevant part:

"(a) A person commits stalking when he or she, knowingly and without lawful justifi­cation, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and:

(1)  at any time transmits a threat to that person of immediate or future bodily harm, sexual assault, confinement or re­straint; or

(2) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or re­straint."  720 ILCS 5/12-7.3 (West 1994).

Defendant initially challenges the constitutionality of the stalking statute.  We stress that a statute enjoys a strong pre­sump­tion of con­sti­tu­tion­al­ity.  
Peo­ple v. War­ren
, 173 Ill. 2d 348, 355, 671 N.E.2d 700, 704-05 (1996).  In addressing a ques­tion of con­sti­tu­tion­al­ity, we must ascertain and give ef­fect to the legisla­ture's in­tent in enacting the statute.  
Fur­ther­more, we must con­strue the statute so as to sus­tain its con­stitu­tional­ity and pre­sume any inter­pre­tation that renders the law valid was intend­ed by the legislature.  
Peo­ple v. Bailey
, 167 Ill. 2d 210, 225, 657 N.E.2d 953, 960-61 (1995).  

The purpose of the stalking statute is to pro­tect against the fear and violence associated with predatory and unin­vited conduct.  In en­act­ing the stat­ute, the leg­isla­ture sought "to pre­vent vio­lent attacks by prohibit­ing conduct that may pre­cede them."  
Peo­ple v. Holt
, 271 Ill. App. 3d 1016, 1021, 649 N.E.2d 571, 577 (1995).  The legislature addi­tionally intend­ed to "avert the ter­ror, intimi­da­tion, and jus­tifi­able appre­hen­sion caused by the harassing con­duct itself."  
Holt
, 271 Ill. App. 3d at 1021, 649 N.E.2d at 577.  In realizing such conduct is often a pre­cur­sor to fu­ture vio­lence, the statute al­lows law en­force­ment au­thor­i­ties to act before a victim is actually injured.

De­fen­dant first argues section 12-7.3 is void for vague­ness and overbreadth.  De­fen­dant maintains 
Bailey
 re­solved these is­sues contrary to his position and that he raises them here sole­ly to avoid waiv­er.  
As de­fen­dant contends, the court in 
Bailey
 found the stalk­ing stat­ute neither unconstitu­tionally vague nor overly broad.  How­ev­er, the court re­solved these issues strict­ly with­in the con­text of the pre-1993 ver­sion of the stat­ute and not with­in the con­text of the current legis­la­tion.  
Bailey
 167 Ill. 2d at 223, 657 N.E.2d at 960.  Thus, 
Bailey
 is not dis­posi­tive here, and defendant is not pre­cluded from chal­lenging the consti­tutionality of the statute on these grounds.  Nev­er­the­less, be­cause de­fen­dant has failed to provide sufficient argu­ment or relevant au­thority in support of his posi­tion, we deem these issues waived.  155 Ill. 2d R. 341(e)(7); 
Peo­ple v. Dinger
, 136 Ill. 2d 248, 254, 554 N.E.2d 1376, 1378 (1990).

Defendant further focuses his constitutional challenge on sub­sec­tion (a)(2), which re­quires that the accused's conduct place the vic­tim in rea­son­able apprehension of "bodily harm, sexual as­sault, confine­ment or re­straint."  720 ILCS 5/12-7.3(a)(2) (West 1994).  Defendant contends, because subsec­tion (a)(2) does not re­quire the accused to knowingly place the victim in rea­son­able apprehen­sion of the specified conduct, the statute im­pos­es crimi­nal lia­bility absent proof of a particular mind state.  As such, defendant argues the statute violates his due process rights guar­anteed under the Illinois and federal consti­tutions.

Defendant's argument has been rejected in 
Peo­ple v. Cortez
, 286 Ill. App. 3d 478, 676 N.E.2d 195 (1996), and 
People v. Rand
, 291 Ill. App. 3d 431, 439, 683 N.E.2d 1243, 1248 (1997).  In 
Cortez
, the de­fen­dant ar­gued the current version of the stalk­ing stat­ute was uncon­sti­tu­tion­ally overbroad be­cause
 no mental state, such as knowl­edge, accom­panied ei­ther subsec­tion (a)(1) or (a)(2).  As a result, defen­dant argued the stat­ute encompassed innocent con­duct.  In dis­agree­ing with the defendant's conten­tion, the court not­ed if the stat­ute in ques­tion pre­scribes "'a par­tic­u­lar men­tal state with re­spect to the of­fense as a whole, without distin­guishing among the ele­ments thereof, the prescribed mental state applies to each such ele­ment.'" 
 
Cortez
, 286 Ill. App. 3d at 481, 676 N.E.2d at 198, quoting 720 ILCS 5/4-3(b) (West 1994).  The court read the terms "know­ing­ly" and "without lawful authori­ty" as modi­fying not only the acts of fol­low­ing and surveilling, but the con­duct de­scribed in subelements (a)(1) and (a)(2) as well.  
On this basis, the court determined the stat­ute pro­scribes only cul­pable conduct.  
Cortez
, 286 Ill. App. 3d at 481, 676 N.E.2d at 198; see also 
Rand
, 291 Ill. App. 3d at 438, 683 N.E.2d at 1247 (same).  We agree with the hold­ings of 
Cortez
 and 
Rand
 and like­wise read a culpa­bility re­quirement in subsec­tion (a)(2).  Ac­cording­ly, we find the cur­rent stalk­ing leg­is­lation con­stitu­tion­al.

B.  Sufficiency of Evidence

Defendant next contends the evidence is insufficient to support his conviction for stalking.  In considering a challenge to the suffi­ciency of the evidence, the rele­vant in­qui­ry is "whether, viewing the evidence in the light most fa­vor­able to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reason­able doubt."  
Peo­ple v. Brown
, 169 Ill. 2d 132, 152, 661 N.E.2d 287, 296 (1996).  A defendant's con­vic­tion will not be over­turned on re­view un­less the fact finder's ver­dict is so im­prob­able, unrea­son­able, or unsatis­fac­tory that it cre­ates a rea­son­able doubt as to the defendant's guilt.
  In a bench trial, a reviewing court will re­spect the weight given by the trial judge to the witnesses' tes­timo­nies, their cred­ibil­i­ty and the rea­son­able infer­ences drawn from the evi­dence.  
Peo­ple v. Kitch­en
, 159 Ill. 2d 1, 25, 636 N.E.2d 433, 443-44 (1994).

Defendant argues his conviction must be reversed be­cause Jennifer's testimony fails to show she was twice placed in rea­son­able apprehension of bodily harm, assault, con­finement or re­straint.  According to defendant, the plain lan­guage of the stat­ute requires the State to establish two inci­dents in which the accused's acts of fol­low­ing or surveillance placed the victim in apprehen­sion of the spec­ified misconduct.  In other words, de­fen­dant urges each act of fol­low­ing or surveil­lance must be ac­compa­nied by a particular apprehen­sion in the vic­tim.

As a primary rule of statutory construction, we must as­cer­tain and give effect to the intent of the legis­la­ture.  In de­ter­mining the legisla­ture's in­tent, we must read the statute as a whole and consider all relevant parts.  
Peo­ple v. Lew­is
, 158 Ill. 2d 386, 389, 634 N.E.2d 717, 719 (1994).  
Aside from the specific word­ing of the statute, we may also focus on the "rea­son and neces­sity for the law, the evils sought to be reme­died, and the pur­pose to be achieved."  
People v. Frieberg
, 147 Ill. 2d 326, 345, 589 N.E.2d 508, 517 (1992).

Pursuant to the above guidelines, we construe the stalking statute to require two separate instances where the victim is placed in reasonable apprehension of bodily harm, sexu­al assault, confinement or restraint.  As employed in the stat­ute, the phrase "on at least 2 separate occasions" relates not only to the acts of following and sur­veilling, but also the par­ticular ap­prehension felt by the victim.  720 ILCS 5/12-7.3(a) (West 1994).  Signifi­cantly, sub­sec­tion (a)(2) does not contain a tem­po­ral reference like sub­section (a)(1), which provides that the accused's threat can be transmit­ted "at any time" (720 ILCS 5/12-7.3(a)(1) (West 1994)).  Con­se­quently, the accused's con­duct, at a mini­mum, must twice place the victim in reasonable ap­pre­hen­sion of the miscon­duct listed in subsection (a)(2).  We, how­ever, do not in­ter­pret the stat­ute to re­quire that such ap­pre­hen­sion stems from the accused's acts of fol­lowing or sur­veil­lance.  A show­ing that the victim's fears arose apart and sepa­rate from the requi­site acts of follow­ing and sur­veil­lance would be suf­fi­cient under the stat­ute.  Such a showing naturally in­volves con­sider­ation of the time frame in which the accused's actions oc­curred, and a deter­mina­tion as to whether a suf­fi­cient tem­po­ral prox­im­i­ty ex­ists be­tween the acts of fol­low­ing and sur­veillance and the victim's apprehen­sion would be with­in the prov­ince of the trier of fact.  Our reading of the statute is con­sis­tent with the legislature's purpose of deterring particu­lar pat­terns of harass­ing con­duct.

Con­trary to defendant's as­ser­tion, Jennifer was not required to ex­pressly tes­tify about her apprehension.  Subsection (a)(2) essentially sets forth the tra­di­tion­al defi­ni­tion of as­sault.  
See 
Peo­ple v. Zamudio
, No. 1-95-1246, slip op. at 8 (De­cem­ber 24, 1997), ___ Ill. App. 3d ___, ___, ___ N.E.2d ___, ___.  As such, the de­ter­mina­tion of wheth­er the vic­tim was placed in rea­sonable appre­hen­sion of "bodily harm, sexual as­sault, con­fine­ment or re­straint" will be judged by an objective standard.  The vic­tim, therefore, need not tes­ti­fy ex­plic­itly about his or her apprehen­sion.  Rath­er, the trier of fact may reasonably infer such ap­pre­hen­sion from the facts and cir­cum­stances of the case.  See 
People v. Enerson
, 202 Ill. App. 3d 748, 749-50, 559 N.E.2d 801, 803 (1990) ("[i]t is not neces­sary that the victim expressly tes­tify that he was in apprehension of a battery to sustain a con­viction [for criminal assault]; rath­er, it can be shown infer­en­tially based on the conduct of the defen­dant and the victim"); accord 
Peo­ple v. Ferguson
, 181 Ill. App. 3d 950, 953, 537 N.E.2d 880, 882 (1989); 
People v. Bur­rows
, 64 Ill. App. 3d 764, 766, 381 N.E.2d 1040, 1042 (1978).  

Upon re­view of the re­cord, we con­clude the evi­dence ade­quate­ly sup­ports the trial court's find­ing that Jennifer was placed in rea­sonable appre­hen­sion of bodily harm as a result of defendant's conduct.  At all relevant times, Jennifer knew defen­dant only in her ca­pac­ity as a Best Buy em­ployee.  She specifi­cally recalled an instance when defendant grabbed her hand in an unusual manner and testified that defendant's behav­ior there­af­ter "fright­ened" and "con­cerned" her.  In addition, Jennifer tes­ti­fied that defendant followed her in her vehicle on two occa­sions as she drove home from teaching.  On one of these occa­sions, Jennifer stat­ed she was "ab­so­lute­ly ter­ri­fied" of de­fen­dant and believed defendant intended to harm her.  A short time after the second following incident, de­fen­dant was seen sit­ting in his vehi­cle imme­di­ately out­side Jennifer's place of em­ploy­ment.  Upon no­tic­ing de­fen­dant, Jennifer felt the need to be escorted by store security to her car.  Jennifer saw de­fen­dant near her home about a week and a half later, and she saw him again parked out­side Best Buy on November 18.  On the latter occa­sion, Jennifer noti­fied the po­lice and filed a for­mal crim­i­nal com­plaint against defen­dant.  The trial court, as trier of fact, was primarily re­spon­sible for evaluating the cred­ibility of the wit­nesses and resolv­ing any conflicts in their testimony. 
 
People v. Sanchez
, 115 Ill. 2d 238, 261-62, 503 N.E.2d 277, 284 (1986).  As such, the trial judge was not re­quired to accept defendant's version of events.  Given the total­ity of the circum­stances, the trial court properly found that defendant's per­sis­tent and unwel­come con­duct placed Jennifer in reasonable appre­hension of bodily harm.

In the alternative, defendant argues the evidence fails to show he subjectively knew his behavior caused Jennifer's ap­pre­hen­sion.  As previously men­tioned, sub­sec­tion (a)(2) re­quires a show­ing that the accused "know­ing­ly" placed the vic­tim in rea­son­able appre­hen­sion of "bodily harm, sexual as­sault, con­fine­ment, or re­straint."  720 ILCS 5/12-7.3(a)(2) (West 1994).  The accused's knowl­edge may be in­ferred from the facts and circum­stances of the case (
Holt
, 271 Ill. App. 3d at 1025, 649 N.E.2d at 579), and the accused need not admit he possesses knowledge for the trier of fact to draw such a conclu­sion (
Peo­ple v. Ra­der
, 272 Ill. App. 3d 796, 806, 651 N.E.2d 258, 265 (1995)).  "Knowl­edge of a mate­rial fact can in­clude an aware­ness of the substan­tial prob­ability that the fact exists or that spe­cific conduct is practi­cally certain to produce a given re­sult."  
Holt
, 271 Ill. App. 3d at 1025, 649 N.E.2d at 579, citing 720 ILCS 5/4-5 (West 1992), and Illinois Pattern Jury Instruc­tions, Crimi­nal, Nos. 5.01B(1), (2) (3d ed. 1992).

In light of the evidence already discussed by the court, we find defen­dant "knowingly" placed Jennifer in apprehen­sion of bodily harm.  In addi­tion, we note there was evi­dence that, on sev­er­al occa­sions, defen­dant was explicitly told of Jennifer's con­cerns and or­dered to stay away from her and other mem­bers of the Zanardi fami­ly.  De­fendant re­ceived a let­ter from the State's Attorney's office detailing the effect of his actions on Jennifer and ad­vising that he would be crimi­nally prose­cuted if his conduct did not cease.  The trial court could have proper­ly inferred defen­dant's knowledge for purposes of subsec­tion (a)(2).

Based on the above, we con­clude a rational trier of fact could have found de­fen­dant guilty of stalk­ing be­yond a rea­son­able doubt.

III.  CONCLUSION

For the foregoing reasons, we affirm defendant's con­viction.

Affirmed.

KNECHT and STEIGMANN, JJ., concur.