2020 IL App (1st) 171404-U

No. 1-17-1404

March 25, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 16114 |
| | ) | |
| GRISELDA MARTINEZ, | ) | Honorable |
| | ) | Marc W. Martin, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence at trial was sufficient to sustain defendant's convictions for violating the "owner's duties" section of the Humane Care for Animals Act (510 ILCS 70/3(a)(2) (West 2014)).

¶ 2    Following a bench trial, defendant Griselda Martinez was found guilty of two counts of violating the "owner's duties" section of the Humane Care for Animals Act (Act) (510 ILCS 70/3(a)(2) (West 2014)). The trial court merged the counts and sentenced defendant to two years of probation and 30 days in the Cook County Department of Corrections. On appeal, defendant

challenges the sufficiency of the evidence, arguing that the State failed to prove knowing or reckless intent. Instead, defendant asserts the evidence showed that at most, she was merely negligent where the air conditioning in her van broke down unexpectedly and although she acted promptly to try to fix it, she was unable to prevent 2 of her 11 dogs from dying from exposure to excessive heat.

¶ 3    For the reasons that follow, we affirm.

¶ 4    Defendant's convictions arose from the events of August 16, 2015. She was charged by indictment with two counts of aggravated cruelty to animals and nine counts of cruelty to animals.

¶ 5    At trial, Palatine police officer Arturo Delgadillo testified that the day in question was "[h]ot, over 90 degrees." About 3:15 p.m., he drove into the parking lot of an auto parts store in Palatine. There, he saw a van, parked near the store's entrance, with its rear door wide open. No other doors or windows were open on the van. Delgadillo noticed "dog containers" in the back of the van and bowls stacked up on the right side of the van. He stopped because he observed distressed dogs in the cages inside the van, whimpering and drooling. Defendant, whom Delgadillo identified in court, and a man were standing by the front of the van. Delgadillo and defendant made eye contact. Then, as Delgadillo was getting out of his car, defendant tried to close the "gates" of the van's door. When Delgadillo told defendant the dogs were distressed and needed help, she opened the door. In response to questioning from Delgadillo, defendant indicated the van was hers, and that she was in the process of moving to Streator, Illinois.

¶ 6    Delgadillo smelled the odor of urine and feces and, when he looked inside the van, he again noticed the dogs were distressed. Defendant did not verbally express any concern for the dogs. Delgadillo removed the crates, which were "stacked all the way to the top," from the van. In court,

he identified photographs of the crates and noted feces, urine, and foam on the bottom of some of them. Delgadillo testified that there were 11 dogs total; all were bulldogs except for one Pomeranian. One of the dogs was unconscious. A tan and white English bulldog was foaming at the mouth. A black and white French bulldog was having difficulty breathing and was foaming from its nose. Delgadillo attempted to give that dog water from a bottle that was provided by an employee of the store. Delgadillo called for help and another officer immediately transported that dog to the Golf Rose Animal Hospital. The remaining dogs were lethargic, panting, and whimpering, and were having a hard time breathing.

¶ 7    Delgadillo and the other responding officers splashed the dogs with water and took them into a storage room in the back of the store, where there was air conditioning, while they waited for an animal van to arrive. While inside the store, the tan and white English bulldog collapsed. Eventually, all the dogs were transported to the Golf Rose Animal Hospital.

¶ 8    On cross-examination, Delgadillo indicated that he had observed the dogs for one minute before deciding they were in distress and had spoken with defendant for another minute before he started removing the dogs from the van. He acknowledged that he was unable to tell what the temperature was inside the van and had no knowledge whether the van was functioning properly at that time. Delgadillo also acknowledged that defendant helped him remove the crates from the van after he asked her to do so. He agreed that the man he had seen standing by the front of the van was "attempting to service the vehicle," but stated that he did not know what the man was trying to fix and said he did not see any cans of freon. Delgadillo also agreed that, at some point, after "maybe ten minutes," defendant's family members arrived at the scene. Delgadillo denied that defendant requested his assistance in directing her to an animal hospital.

¶ 9    Christina McCratic, a veterinarian at Golf Rose Animal Hospital in Schaumburg, testified that on the afternoon in question, Palatine police brought two deceased and nine living dogs to the hospital. Ten were bulldogs and one was a Pomeranian. McCratic and the technicians on her team treated all the dogs. McCratic explained that bulldogs have "special needs in the respiratory system," in that their narrow nostrils, narrow tracheas, and elongated soft palates can cause them to asphyxiate.

¶ 10    The first dog to arrive, a black and white French bulldog that McCratic coded as dog "J," was dead on arrival. Its legs were stiff, its pupils were fixed and dilated, there was no heartbeat, and there were indications of severe hyperthermia.[1] McCratic noted that dog J had a strong odor of urine and feces, a lot of staining on its teeth, ear infections, and eye infections. She stated that the infections would not have "suddenly happened" that day, but rather, agreed they were long-term conditions. There was a lot of saliva coming from dog J's mouth, which indicated to McCratic that it had been panting heavily for a long period of time. Dog J's temperature was at least 108 degrees. McCratic was unable to determine its actual temperature, as the maximum temperature on her thermometer was 108 degrees. She stated that a normal temperature for a healthy dog would be 101 to 102 degrees. McCratic opined that the cause of dog J's death was severe heat stroke, hyperthermia, and asphyxiation.

¶ 11    The next dog McCratic treated, dog "K," was an English bulldog. It was dead on arrival, in full rigor mortis. Dog K had "quite a bit" of foam coming out of its mouth, a strong odor of

---

[1] Although the transcript indicates that McCratic referred to "hypothermia," this appears to be a transcription error.

urine and feces, and signs of chronic infection in both ears. Its temperature was 107.6 degrees. McCratic testified that dog K died as a result of heat exhaustion and asphyxiation.

¶ 12    With regard to the other nine dogs, McCratic stated they were all intact, had urine or feces staining of various degrees on their legs, had staining from licking, and had ear infections. The bulldogs had bacteria or yeast infections in the folds of their faces. McCratic described the ear and skin infections as chronic conditions and stated that she observed no signs that the infections were being treated by cleaning or by medication. Except for the youngest puppy, all the dogs had severely overgrown nails. Dog "B," which was approximately six to nine weeks old, had a very large exposed umbilical hernia. According to McCratic, this congenital disorder would have been present at birth and would need surgical correction. The surviving dogs were cooled to an appropriate temperature and given food and water.

¶ 13    On cross-examination, McCratic admitted she did not know how long the dogs were in police custody before they arrived at the animal hospital. All the dogs arrived wet, which indicated to her that they had been cooled by the police department. McCratic recalled that the outdoor temperature that day was over 90 degrees, and that it was humid. McCratic agreed that the anxiety of a car ride could cause a dog to urinate or defecate.

¶ 14    The trial court asked McCratic whether she could say that the two dogs that died had suffocated. McCratic answered, "We would have had to do an autopsy, but the fluid, the foam coming out of the mouth, that is the foam that would have been going into their trachea when they breathe and would cause suffocation and obstruction of their air flow, and because of the narrow trachea the bulldog has, that amount of foam would suffocate them." McCratic indicated that this "amount of foam" was present in the two deceased dogs, but not in the surviving dogs. In response

to further questioning on the topic from defense counsel, McCratic explained that because the definition of suffocation is inability of air flow, the copious amounts of fluids coming out of the two deceased dogs' mouths "could be a reason for suffocation." She agreed that in order to make a determination of suffocation to a specific degree of scientific certainty, an autopsy would be necessary.

¶ 15    On redirect, McCratic opined that stacking plastic dog crates in a minivan would result in insufficient air flow, which would cause animals to breathe faster, which would then further heat the space and cause a life-threatening situation. McCratic stated that this effect would have been cumulative, explaining, "The harder they breathe to cool off taxes the cooling system, the more there would be agitation to their system, the more the soft [palate] which is just part of the anatomy of a bulldog, and as I described earlier, their soft [palate] swells, it intrudes their airway and they have to breathe harder to get air flow and it becomes a snowball effect and they overheat."

¶ 16    The parties stipulated that the temperature in Palatine on the day in question was 90 degrees.

¶ 17    After the State rested, defendant moved for a directed finding. The trial court granted the motion on the nine counts pertaining to the dogs that had not died, reasoning that the State had not proved suffocation or overheating, as was charged in the indictment. The court denied the motion with regard to the two counts that charged aggravated cruelty to animals based on the deaths of the black and white French bulldog and the tan and white English bulldog.

¶ 18    Arturo Mendez testified that around 11 a.m. on the day in question, he went to defendant's house in Round Lake to help her move to Streator, a drive he estimated would take them "[m]aybe over two hours." Defendant took her 11 dogs outside, and then, while the dogs were loose in the

house, defendant started her van so that it would cool off. At some point, defendant put the dogs in crates and put the crates in the van. When Mendez got into the van with defendant, the air conditioning was working and the temperature inside the van was cold.

¶ 19 Mendez testified that about 10 minutes or less into their drive, he noticed that "all of a sudden," it was hotter inside the van. Defendant and Mendez opened the van's windows and went to the nearest gas station. They went inside to try to buy "gas" for the air conditioning, but the gas station did not stock the item. An employee gave them directions to an auto parts store. Defendant and Mendez drove to the auto parts store, which was about three or four minutes from the gas station, went inside, and bought the "gas" they needed. The van's windows were open while he and defendant were inside the store.

¶ 20 When Mendez and defendant went back outside, defendant opened the van's doors and Mendez began putting the "gas" into the air conditioning unit. Within 10 minutes of arriving at the auto parts store, Mendez saw a police officer pass by, return, and start talking with defendant. The officer told defendant he was going to investigate what was going on, and defendant told the officer she needed to go somewhere that a veterinarian could look at her dogs. The officer also talked with Mendez while Mendez continued working on the air conditioning. According to Mendez, the van became a "little bit cooler" during this time.

¶ 21 At some point, defendant's ex-husband, two sons, and friend also arrived at the auto parts store. After the officer had been on the scene for about 20 to 25 minutes, Mendez took the dogs out of the van by himself. A woman from the auto parts store opened the store's back door and said to move the dogs inside.

¶ 22   On cross-examination, Mendez reiterated that he himself took the dogs out of the van. He denied that the police took the dogs out of the van or into the store. Mendez also denied knowing that one of the dogs had died. Rather, he stated it had fainted, and then an officer wrapped it up and took it away.

¶ 23   Robert Martinez, defendant's nephew, testified that on the day in question, he was following defendant's van in a car. Among the items in his car was a cooler with water and ice for defendant's dogs. Around 5 p.m., Martinez saw defendant and "cops" stopped at an auto parts store. Martinez parked, showed an officer his identification, and then started helping with the dogs. When asked what he meant by "help," Martinez explained that he gave the dogs water from the cooler and put the dogs "in the back" so they could be out of the sun. He did not see the police take the dogs out of defendant's van or do anything with the dogs. Rather, it was Mendez who took the dogs out of the back of the van.

¶ 24   Defendant testified that she loved her dogs, gave them food and clean water every day, and had a place to bathe them. On July 29, 2015, she took her van to a shop and had the air conditioning fixed.[2] Eighteen days later, on the day in question, she was moving from Round Lake to Streator, where she planned to start a dog breeding business. When she and Mendez left her house in Round Lake, the air conditioning in the van was working. At some point during the drive, defendant felt the air in the van getting warmer. She stopped at the first gas station she found, but it did not have the item she needed. At the direction of someone at the gas station, she went to an auto parts store.

---

[2] During her testimony, defendant identified Defense Exhibit No. 2 as a "document" from "[w]hen I took the truck to have the air conditioning fixed." She stated that the document was dated July 29, 2015, and that she received it from Pep Boys after they competed some work on her vehicle's air conditioning. Although the document was received into evidence, it is not included with the exhibits in the record on appeal. At trial, the State indicated that it "would stipulate that she had that car repaired, that it needed repairs to the air conditioning."

¶ 25     At the auto parts store, defendant selected the "biggest bottle that [she] could find." While she paid, Mendez went outside to start repairing the air conditioning. Defendant then went outside, opened the rear door of the van, and gave water to one of her dogs. When she felt cold air coming from the air conditioning, defendant closed the van door and was going to tell Mendez to take the dogs to an animal hospital. However, at that point, a police officer called out to her and asked her to open the van. Defendant stated that the first thing she said to the officer was that she wanted to take her dogs to an animal hospital. The officer asked her if the dogs in the van belonged to her or whether they were stolen. Defendant told the officer the dogs were not stolen and reiterated that she needed to take them to an animal hospital. She was worried because the dogs were very hot. When the officer stated that she did not have the air conditioning turned on in the van, she responded that it was running, and informed him she had recently had it fixed. The officer asked for proof of the repair, but defendant told him she needed to get the dogs to the animal hospital and could provide "all the information" afterwards.

¶ 26     While defendant was talking with the police officer, Mendez started taking the dogs out of the van. Defendant estimated that about 30 minutes passed between the time the officer stopped her from closing the van door to the time Mendez started moving the dogs. One of the dogs had passed out by the time Mendez took it out of the van. However, defendant stated the dog was still alive. Around this time, defendant's family members had arrived at the scene and were helping to take the dogs out of the back of the van and give them water. Eventually, Mendez, defendant's son, and defendant's nephew took the dogs inside the auto parts store.

¶ 27     On cross-examination, defendant stated that she went to the auto parts store, rather than an animal hospital, because at that point her dogs' health was not doing "gravely." Defendant

acknowledged that she was aware her dogs were a "special needs" breed and that they had breathing difficulties. She denied that there was urine and feces in the van.

¶ 28    On redirect, defendant testified that when she arrived at the auto parts store, the two dogs that eventually died were overheated, but their condition worsened while she was talking with the police. Defendant stated that one of two dogs that died had an ear infection, which she was treating with medicine, but that the other dog had no infections. She also stated that while she was driving, she had opened two small windows in the back of the minivan. When asked whether she closed the windows when the police arrived, defendant answered, "He didn't let me."

¶ 29    The State recalled Officer Delgadillo in rebuttal. He clarified that when he arrived at the scene, a man was working on the vehicle under the hood. Delgadillo testified that defendant did not tell him she wanted to get the dogs to an animal hospital or that she was concerned about the dogs. By the time her friends and family arrived at the scene, Delgadillo and another officer had taken all the dogs out of the van and splashed some of them with water. Delgadillo stated that he did not stop defendant from leaving the scene to take her dogs to an animal hospital.

¶ 30    The trial court concluded that the State had not proved defendant intentionally committed an act to cause the death of a companion animal. However, the court found that defendant acted knowingly. Accordingly, the court found defendant guilty of two counts of a lesser-included misdemeanor, *i.e.*, two violations of the "owner's duties" section of the Act, which provides that an animal's owner shall provide adequate shelter and protection from the weather. 510 ILCS 70/3(a)(2) (West 2014). In the course of announcing judgment, the trial court stated that it did not find defendant or Martinez to be credible.

¶ 31    At sentencing, which took place immediately following judgment, the trial court imposed a term of two years of probation and 30 days in the Cook County Department of Corrections. That same day, October 6, 2016, defendant filed a motion for a new trial, which was denied. On November 4, 2016, defendant, through new counsel, filed a pleading titled "Motion for a Finding of Not Guilty or a New Trial," which also included a prayer, made in the alternative, that the trial court reduce defendant's sentence to supervision. The trial court characterized the pleading as a motion to reconsider and, because it included an allegation of ineffective assistance of trial counsel, set it for hearing. Following a hearing on May 15, 2017, the trial court denied the motion. Defendant filed a timely notice of appeal.

¶ 32    On appeal, defendant contends that her convictions must be reversed because the State failed to prove knowing or reckless intent, the required *mens rea* for the crime of which she was convicted. Defendant does not contest that the two dogs that died were deprived of adequate protection from the weather. However, defendant asserts that the evidence showed her dogs' deaths were a terrible accident, or, at most, that she was merely negligent where the air conditioning in her van broke down unexpectedly and although she acted promptly to try to fix it, she was unable to prevent the dogs from dying from exposure to the excessive heat. Defendant argues that her actions did not constitute a gross – as opposed to substantial – deviation from a reasonable standard of care and that there was no evidence she was consciously aware of the risk that the circumstances would lead to a deprivation of adequate shelter and protection from the weather.

¶ 33    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*,

443 U.S. 307, 318-19 (1979). The reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). In addition, the credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 34    In general, a crime consists of an *actus reus*, or a guilty act, and a *mens rea*, or a guilty mind. *People v. Karberg*, 356 Ill. App. 3d 500, 502 (2005). *Mens rea* is an essential element of a crime (*People v. Jackson*, 2017 IL App (1st) 142879, ¶¶ 28, 30) that can rarely be proved by direct evidence (*People v. Sanchez*, 292 Ill. App. 3d 763, 771 (1997)). Rather, *mens rea* is generally inferred from circumstantial evidence. *People v. Holt*, 271 Ill. App. 3d 1016, 1025 (1995). Whether a defendant acted with the requisite *mens rea* is a question for the trier of fact (*People v. Wehrwein*, 209 Ill. App. 3d 71, 81 (1990)), and an appellate court will not substitute its judgment that of the trier of fact on this element unless the trial court's judgment was inherently implausible or unreasonable (*People v. Price*, 225 Ill. App. 3d 1032, 1035 (1992)).

¶ 35    The "owner's duties" section of the Act states that "[e]ach owner shall provide for each of his or her animals: *** (2) adequate shelter and protection from the weather." 510 ILCS 70/3(a)(2) (West 2014). The "owner's duties" statute does not prescribe a specific *mens rea*. As such, any of the mental states of intent, knowledge, or recklessness will satisfy the *mens rea* requirement for a violation of the statute. 720 ILCS 5/4-3(b) (West 2014) ("If the statute does not prescribe a

particular mental state applicable to an element of an offense *** any mental state defined in Sections 4-4 [intent], 4-5 [knowledge], or 4-6 [recklessness] is applicable."). Here, the trial court found that defendant did not act intentionally. As such, the question before us is whether defendant acted knowingly or recklessly, in which case her convictions may be affirmed, or whether she merely acted negligently, in which case reversal would be justified.

¶ 36   A person acts knowingly if she is consciously aware that her conduct is practically certain to cause injury. 720 ILCS 5/4-5 (West 2014); *People v. Moore*, 358 Ill. App. 3d 683, 688 (2005). A person acts recklessly if she consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and that disregard constitutes a "gross deviation" from the standard of care that a reasonable person would exercise in the situation. 720 ILCS 5/4-6 (West 2014); *Moore*, 358 Ill. App. 3d at 688. Finally, a person acts negligently when she fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and that failure constitutes a "substantial deviation" from the standard of care that a reasonable person would exercise in the situation. 720 ILCS 5/4-7 (West 2014). As noted above, the determination of a defendant's mental state may be inferred from circumstantial evidence, and this task is particularly suited to the trier of fact. *People v. DiVincenzo*, 183 Ill. 2d 239, 252 (1998).

¶ 37   Here, the trial court found that defendant acted knowingly. Specifically, it found that defendant "knowingly placed the two companion animals described in counts 1 and 2 in harm's way. She did not provide them with adequate shelter and protection from the weather and exposed them to inhumane conditions." We find that the trial court could determine, based on reasonable inferences from the evidence, that defendant's conduct was at least reckless.

¶ 38    The evidence at trial established that the day in question was 90 degrees and humid. Defendant knew that 10 of her dogs, because they were bulldogs, were "special needs" dogs with breathing difficulties. Nevertheless, defendant placed her 11 dogs in cages and crates and stacked them in the back of her minivan, obstructing the existing air flow, and embarked on what was expected to be a two-hour drive. When Officer Delgadillo arrived at the scene, none of the minivan's windows were open, and the only open door was the back hatch. Defendant then tried to close the back door, an action that could rationally be interpreted as an attempt to hide the conditions of the van's interior and thus as consciousness of guilt. See *People v. White*, 221 Ill. 2d 1, 26 (2006) (attempt to conceal an object "suggested some consciousness of guilt"), *abrogated in part on other grounds by People v. Luedemann*, 222 Ill. 2d 530, 551 (2006). Delgadillo testified that defendant voiced no concern about her dogs' health, did not indicate she wanted to get them to an animal hospital, and did not help him take the dogs out of the back of the minivan until he asked for her assistance.

¶ 39    The veterinary evidence established that the two deceased dogs had thick foam at the mouth which indicated heavy panting for a long period of time during which no further corrective measures were taken. This heavy breathing caused "a snowball effect" that caused the dogs to overheat and asphyxiate.

¶ 40    We are mindful of defendant's arguments that the evidence showed she thought her air conditioning would be working based on its recent repair, that it failed unexpectedly, and that she acted as promptly as any reasonable person could to address the failure. However, as noted above, the trial court specifically found defendant's trial testimony incredible. This was the court's prerogative in its role as the trier of fact (*People v. Moody*, 2016 IL App (1st) 130071, ¶ 52) and

we will not substitute our judgment for that of the trial court on questions of credibility (*Brooks*, 187 Ill. 2d at 131). "Moreover, the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). In turn, this court will not search out possible theories of acquittal and prefer them over the findings of the trial court. *People v. Lee*, 2015 IL App (1st) 132059, ¶ 63. Viewing all the evidence in the light most favorable to the prosecution, which we must, we conclude that a rational trier of fact could find beyond a reasonable doubt that defendant was consciously aware that her conduct on the day in question was practically certain to cause injury to her dogs.

¶ 41    After reviewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. The evidence is not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Defendant's challenge to the sufficiency of the evidence fails.

¶ 42    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 43    Affirmed.