**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180581-U

Order filed April 22, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Knox County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0581 Circuit No. 17-CF-329 |
| | ) | |
| AUSTIN M. MITCHENER, | ) ) | Honorable Paul L. Mangieri, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justice Schmidt concurred in the judgment.
Presiding Justice McDade dissented.

_____

**ORDER**

¶ 1    *Held*:   The State presented sufficient evidence to prove beyond a reasonable doubt that defendant was consciously aware that his conduct was practically certain to cause great bodily harm.

¶ 2    Defendant, Austin M. Mitchener, appeals his conviction for aggravated battery of a child.

Defendant argues (1) the State failed to prove beyond a reasonable doubt that he was consciously

aware that his conduct was practically certain to cause great bodily harm, and (2) he received

ineffective assistance of counsel when defense counsel failed to move for dismissal on the basis of a speedy trial violation. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        The State charged defendant with aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)), alleging that defendant "knowingly and without legal justification cause [*sic*] great bodily harm to K.M. (DOB: 05/03/2017), a child under the age of 13 years, in that said defendant bounced K.M. on his lap without supporting K.M.'s neck causing blood and swelling on the brain and/or seizures and/or shaken baby syndrome."

¶ 5        Officers from the Galesburg Police Department placed defendant under arrest on July 7, 2017. Following defendant's arrest, he remained in continuous custody.

¶ 6        On July 24, 2017, the State served subpoenas on OSF Saint Francis Medical Center in Peoria, and Galesburg Cottage Hospital in Galesburg, requesting "[a]ny and all patient medical records, notes, lab reports, x-rays, diagnosis, emergency room records, itemized billing, etc. of [K.M.]," in order to show the nature and extent of K.M.'s injuries. On August 14, 2017, the State served a subpoena on Children's Hospital of Illinois in Peoria, requesting "[a]ll medical health records for [K.M.], *** including but not limited to medical records, treatment records, diagnosis, prognosis, test results[,] and imaging reports, etc."

¶ 7        Galesburg Cottage Hospital and Children's Hospital of Illinois provided timely responses. OSF Saint Francis Medical Center failed to respond to the subpoena issued in July 2017. The State issued another subpoena requesting records from OSF Saint Francis Medical Center on November 16, 2017.

¶ 8        On November 20, 2017, the State requested to postpone the trial until January 16, 2018, a period of 58 days, on the grounds that one of the subpoenaed medical providers had not yet

provided the medical records requested in July, just three weeks after the initiation of criminal charges against defendant. The State informed the court that the medical records might be incriminating but also had the potential to be exculpatory. Defense counsel agreed that the records could be relevant as mitigation evidence.

¶ 9        The court granted the continuance requested by the State over defense counsel's objection. The court stated: "[T]hese medical records may, in fact, go to establish an aggravated battery or they may be somewhat exculpatory to dis-establish [*sic*] or not rise to a level of aggravated battery." The court specifically noted that it would "grant the motion to continue bearing in mind [defendant] will still be tried within 120 days."

¶ 10       According to the record, OSF Saint Francis Medical Center provided the requested medical records within days of the trial court's ruling allowing the State's request for a continuance. Eventually, defendant waived his right to a jury trial and the case proceeded to a bench trial.

¶ 11       Keely Wheeler, K.M.'s mother, testified that defendant, K.M.'s father, was a good father who loved K.M. Wheeler and defendant were both 19 years old when K.M. was born and she was their first child. Defendant would often take care of K.M. alone, without any harm befalling K.M, and he never hurt K.M. in Wheeler's presence. Defendant and Wheeler sought parenting classes to educate themselves on childcare, though they were only able to find breastfeeding classes, which they attended. Defendant and Wheeler called defendant's mother almost daily with parenting questions.

¶ 12       On June 22, 2017, when K.M. was seven weeks old, Wheeler watched K.M. until late in the evening when defendant returned home from work. Wheeler went to bed and defendant watched K.M. until Wheeler woke up at 9 a.m. the next morning. Wheeler observed K.M.

appeared to be limp in her cradle. Wheeler testified that K.M. was cranky, uncooperative, and her cry sounded unusual. Wheeler had defendant take them to the emergency room.

¶ 13        Defendant testified that he returned home from work at approximately 10:30 p.m. on June 22, 2017. Wheeler went to bed and defendant watched K.M. Defendant went to sleep at approximately 2:30 a.m. and he awoke at 7 a.m. to K.M. crying. Defendant tried to feed K.M., but she would not take her bottle. Defendant tried to change her diaper, but K.M. remained upset. He tried talking and singing to her to no avail. He held her against his chest and leaned back, but K.M. would not stop screaming. Defendant then picked K.M. up, placed her on his knee facing away from his body, and bounced her for approximately 20 to 30 seconds, by his own estimate, without supporting her head. Shortly after he bounced K.M. on his knee, she became quiet and went limp.

¶ 14        Defendant testified that he was not angry with K.M. when he bounced her on his knee, but he "was frustrated because [his] daughter was crying and [he] couldn't figure out what she needed." Defendant did not believe his actions would hurt K.M. or cause her great bodily harm.

¶ 15        On cross-examination, defendant testified that he did not support K.M.'s head while he bounced her on his knee. K.M.'s head was "moving back and forth" but, according to defendant, "[i]t wasn't a wild motion." Defendant was aware that K.M.'s head was unsupported when he bounced her on his knee.

¶ 16        Detective Mark McLaughlin of the Galesburg Police Department testified that he conducted and recorded an interview with defendant. The State played a video recording of the interview in court. The recording documents defendant's recorded statements regarding the events of June 22 and 23, 2017, were consistent with his trial testimony. During the interview, defendant told McLaughlin that when K.M. would not stop crying, he became frustrated with

himself over his inability to determine her needs. Defendant acknowledged that he might have bounced K.M. too hard on the morning in question. He knew that he should have supported K.M.'s head when he bounced her. He did not support her head in this instance because he was more focused on getting her to calm down.

¶ 17 The State tendered Dr. Channing Petrak, medical director of the Pediatric Resource Center at the University of Illinois College of Medicine in Peoria, as an expert witness in pediatrics and child abuse pediatrics. Petrak testified that a computerized tomography (CT) scan showed blood at the base of K.M.'s brain and skull, indicating a head injury. A follow-up CT scan demonstrated decreased brain density and a loss of tissue volume in large areas of K.M.'s brain, indicative of encephalomalacia, where nerve damage causes portions of the brain to become soft and atrophy. Encephalomalacia is an irreparable injury that commonly results in loss of vision, reduced fine motor skills, lessened cognitive ability, seizures, and shortened life expectancy.

¶ 18 Petrak concluded that K.M.'s injuries were caused by abusive head trauma, which she defined as "any injury to the head that was inflicted, whether it's shaking alone, shaken impact, hit in the head with a blunt object. It can be any of those things." K.M.'s clavicle was broken, which could be caused by pressure applied to the bone in a variety of ways, including being bounced while held facing away from the person holding her from under her armpits. Petrak explained that the brains of infants are softer than adult brains and opined that bouncing an infant without supporting the head and neck could cause the type of injury K.M. suffered. According to Petrak, a seven-week-old infant, such as K.M., would be able to support their head for a few seconds when positioned on their stomach.

5

¶ 19    The court found defendant guilty of aggravated battery of a child. The court identified the central issue as whether the State proved beyond a reasonable doubt that defendant knowingly caused great bodily harm to K.M. The court observed that defendant told McLaughlin that he was frustrated when he bounced K.M. The court found that defendant gripped K.M. too hard and bounced her too quickly, noting K.M.'s broken clavicle. The court concluded that "defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another," but he "had to be acting knowingly, that bouncing a child of that tender age in such a form and fashion exerting such force on that child for that period of time is such that the defendant was consciously aware that his conduct was practically certain to cause great bodily harm."

¶ 20    The court sentenced defendant to six years' imprisonment. During sentencing, the court opined, "Is the evidence of record such that when [defendant] engaged in [his] conduct that brought about the injury to [K.M.] that [he] wanted her to be injured to this extent? Absolutely not." However, the court asserted that "it was and still is my determination that in a number of seconds there was intent knowingly to impose some type of harm to the child at that time. I believe that has been proven beyond a reasonable doubt." Defendant appeals.

¶ 21                                        II. ANALYSIS

¶ 22    On appeal, defendant argues (1) the State failed to prove beyond a reasonable doubt that he was consciously aware that his conduct was practically certain to cause great bodily harm, and (2) he received ineffective assistance of counsel when defense counsel failed to move for dismissal on the basis of a speedy trial violation. When a reviewing court considers a sufficiency of the evidence challenge, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

6

elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Circumstantial evidence is sufficient to sustain a criminal conviction. *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996). The trier of fact must "resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court will not replace the trier of fact's judgment with its own regarding the weight of the evidence or witnesses' credibility. *Id.* With respect to the sufficiency of the State's evidence, "a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 23    A person commits aggravated battery of a child "when, in committing a battery, he or she knowingly and without legal justification *** causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years." 720 ILCS 5/12-3.05(b)(1) (West 2016). A person acts knowingly regarding "[t]he result of his or her conduct *** when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5(b). "[A] defendant is presumed to intend the natural and probable consequences of his acts ***." *People v. Terrell*, 132 Ill. 2d 178, 204 (1989). "Knowledge may be inferred from the facts and circumstances of the case." *People v. Holt*, 271 Ill. App. 3d 1016, 1025 (1995).

¶ 24    Defendant argues that the State presented insufficient evidence to prove he was consciously aware that his actions were practically certain to result in great bodily harm. During defendant's interview with McLaughlin, he admitted that he became frustrated when K.M. would not stop crying. Defendant acknowledged that he may have bounced K.M. too hard. Further, defendant knew he was supposed to support K.M.'s head when he bounced her but failed to do so. During his testimony, he confessed that he knew K.M.'s head was "moving back and forth,"

7

unsupported, while he bounced her on his knee, though defendant denied it was a wild motion. Additionally, Petrak testified that K.M.'s broken clavicle was consistent with defendant's recollection that he held K.M. on his knee, facing away from him, and gripped K.M. tightly.

¶ 25 The court could reasonably infer from these facts that defendant was consciously aware his actions were practically certain to cause great bodily harm to K.M., who was only seven weeks old at the time. See 720 ILCS 5/4-5(b) (West 2016). These facts, viewed in the light most favorable to the State, proved beyond a reasonable doubt that defendant was consciously aware that his actions were practically certain to cause K.M. great bodily harm.

¶ 26 Defendant also claims his conviction should be set aside due to the ineffective assistance of defense counsel. Specifically, defendant argues that defense counsel's failure to move for dismissal based on a statutory speedy trial violation constitutes ineffective assistance.

¶ 27 To prevail on such a claim, defendant must show defense counsel performed deficiently, and that deficient performance deprived him of a fair trial. *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). "The failure to satisfy either prong *** precludes a finding of ineffective assistance of counsel." *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). Defense counsel's failure to move for dismissal on speedy trial grounds cannot satisfy either requirement when no lawful basis for arguing a speedy trial violation exists. *Cordell*, 223 Ill. 2d at 385.

¶ 28 First, in order to determine whether counsel was ineffective, we must determine whether a speedy trial violation occurred based on this record. *Id.* "[T]he ultimate question as to whether defendant's statutory right to a speedy trial has been violated is a question of law subject to *de novo* review." *People v. Pettis*, 2017 IL App (4th) 151006, ¶ 17.

¶ 29 The United States Constitution, the Illinois Constitution, and Illinois statutory law guarantee a defendant's right to a speedy trial. U.S. Const., amend. VI; Ill. Const. 1970, art. I,

8

§ 8; 725 ILCS 5/103-5 (West 2016). "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2016). A court may grant a 60-day extension where "the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." *Id.* § 103-5(c).

¶ 30        Defendant argues that his right to a speedy trial was violated because his trial did not take place within the 120-day period required by statute. The State asserts that the trial court properly granted an extension of the typical 120-day period and scheduled the trial to take place within 180 days under the circumstances present in this record. *Id.* § 103-5(c). The State does not dispute defendant's calculations, which show that his trial occurred 327 days after his arrest, and 131 of those days are attributable to the State. The scheduled jury trial date was on course to meet the speedy trial deadline. Just before the scheduled trial date it became apparent to the State that a medical provider had not responded to the State's subpoena. Consequently, the State requested to delay the trial date for 58 days in order for the State to secure all medical records previously subpoenaed. The State asserted the medical records at issue were material and claimed the State was diligent when requesting those medical records shortly after defendant's arrest.

¶ 31        It is not uncommon for medical providers to respond slowly to subpoenas requesting complicated and often lengthy records. We conclude that the trial court properly granted the State's request for a short extension of time based on the unique circumstances contained in this record. Here, the 131-day delay attributable to the State falls well within the properly extended 180-day window authorized by statute. Therefore, defendant was not denied a speedy trial and

9

defense counsel was not ineffective for failing to request the trial court to dismiss the charges on speedy trial grounds.

¶ 32                               III. CONCLUSION

¶ 33        The judgment of the circuit court of Knox County is affirmed.

¶ 34        Affirmed.

¶ 35        PRESIDING JUSTICE McDADE, dissenting:

¶ 36        The State failed to prove defendant guilty of aggravated battery of a child beyond a reasonable doubt. Accordingly, I respectfully dissent.

¶ 37        There is zero evidence that defendant was consciously aware that, when he attempted to bounce his crying infant daughter to sleep, his actions were practically certain to cause her great bodily harm. See 720 ILCS 5/12-3.05(b)(1) (West 2016). A person acts knowingly regarding "[t]he result of his or her conduct *** when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5(b). In affirming defendant's conviction, the majority relies on defendant's statement that he became frustrated with himself when K.M. would not stop crying, his admission in hindsight that he may have bounced her too hard, his knowledge that he was supposed to support K.M.'s head but failed to do so, such that her head moved back and forth as she bounced, and Dr. Petrak's testimony that K.M.'s broken clavicle was consistent with the way defendant held K.M. None of these facts demonstrates that defendant had the requisite intent that alone can satisfy the elements of the charged offense. Indeed, these facts are entirely consistent with the conclusion that K.M.'s injuries were the result of a tragic accident that will impact his daughter and haunt defendant for the rest of his life.

¶ 38        Defendant testified that his frustration was aimed at himself for his inability to identify his infant daughter's needs as she cried. Defendant's frustration with his situation must not be

10

misconstrued as frustration toward K.M. Further, defendant testified that, in prior instances where K.M. cried, he safely bounced her on his knee as part of a series of measures he took to calm her. It is unreasonable to presume that he knew K.M. would suffer great bodily harm because he may have bounced her harder than usual on the morning in question. Here, he bounced K.M. on his knee until she became still, which he understood to mean that he successfully and safely bounced her to sleep. Neither defendant's admitted frustration nor his harder than usual bouncing proves beyond a reasonable doubt that he was consciously aware that his actions were practically certain to cause K.M. great bodily harm.

¶ 39   The majority also cites Petrak's testimony regarding K.M.'s broken clavicle, but Petrak's testimony focused on K.M.'s injuries, not defendant's intent on the morning in question. Indeed, Petrak's testimony made no mention of defendant whatsoever. K.M.'s injuries are entirely consistent with defendant's testimony. The question we face is not whether defendant's actions caused K.M.'s injuries, but whether defendant was consciously aware that his actions were practically certain to do so. The State would have us conclude that defendant intended to harm K.M. simply because his actions caused K.M. great bodily harm, virtually eliminating its obligation to prove the single most critical element of the charged offense. We have no authority to go down that path.

¶ 40   Additionally, defendant's lack of parenting knowledge and experience is amply documented in the record and it undercuts the majority's holding regarding defendant's intent. Defendant was a 19-year-old father with no previous childcare experience. He and Wheeler searched for parenting classes to educate themselves on childcare, but found none. They managed to find breastfeeding classes, which they attended. In the absence of professional instruction, defendant and Wheeler frequently reached out to defendant's parents for advice

11

regarding caring for K.M. Based on defendant's lack of parenting knowledge and experience, I cannot conclude that he acted knowingly regarding the consequences of his actions here.

¶ 41    From my review of the record, I agree with the circuit court's finding that "defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another." Indeed, it is difficult to reconcile this observation with the court's ultimate determination of guilt. Defendant made a serious mistake, which caused accidental harm. He did not act knowingly regarding the results of his conduct because he was not consciously aware that his conduct would result in great bodily harm to K.M. See 720 ILCS 5/4-5(b) (West 2016); see also *People v. Spani*, 46 Ill. App. 3d 777, 780 (1977) (finding that accidental conduct cannot be equated with recklessness, a less demanding intent element than knowing). Therefore, defendant lacked the intent necessary to satisfy the elements of the crime charged. I would hold that the State failed to prove defendant guilty of aggravated battery of a child beyond a reasonable doubt and find the evidence to be "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Collins*, 106 Ill. 2d at 261. It also bears noting that this decision, rendered without evidence of the requisite mental state, leaves the young mother to cope with the exigencies of caring for this injured child without the aid and support of the child's father.

¶ 42    I would reverse this conviction.